356 F.Supp. 1331 (1973)
BIEDENHARN REALTY COMPANY, INC.
v.
UNITED STATES of America.
Civ. A. Nos. 16798-16800.
United States District Court, W. D. Louisiana, Monroe Division.
March 20, 1973.
Paul K. Kirkpatrick, Jr., Hudson, Potts & Bernstein, Monroe, La., for plaintiff.
Fleming deGraffenreid, Atty., Gen. Tax Div., Dept. of Justice, Dallas, Tex., Donald E. Walter, U. S. Atty., and Dosite H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., for the Government.
DAWKINS, Chief Judge.

OPINION
This controversy brings before us the "old, familiar, recurring, vexing and oft-times elusive" problem of whether to treat profit arising out of sales of subdivided real estate as capital gains or ordinary income.
In United States v. Winthrop, 417 F.2d 905 (5th Cir., 1969), the Fifth Circuit *1332 chose the ad hoc approach is reaching a solution to that controversy. Here, we take the same approach.
Of course, the applicable statutory provision is 26 U.S.C. § 1221:
Capital Asset Defined
"For purposes of this subtitle, the term `capital asset' means property held by the taxpayer (whether or not connected with his trade of business), but does not include
(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; . . ."
Biedenharn Realty Company, Inc., (taxpayer) is a corporation which was organized by Joseph Biedenharn in 1923, the original stockholders consisting of members of his family. This corporation was formed as an investment company according to B. D. Biedenharn, this being uncontradicted by the Government, in order that members of the family might aggregate their investments rather than each investing individually. In its charter the stated business is farming, investments, and rental property, its primary business being investments.
Those investments include two Coca-Cola manufacturing and bottling plants, warehouses, a shopping center, residential houses for rent, store buildings and farm property, consisting of two farms outside the City of Monroe and Hardtimes Plantation, at one time also beyond the City limits, but now included therein, portions of which are the bones of contention in this suit. The company also has a portfolio of stocks and bonds. Additionally, it owns a motel and other businesses.
Hardtimes Plantation was acquired in 1935, the stated purpose for the acquisition being farming and future investment. The corporation paid $50,000 for approximately 1,000 acres of land, the purchase being consummated during the middle of the Great Depression. Following acquisition of Hardtimes, the corporation farmed this land. At first, it employed a farm manager, and later entered into a contract with one McHenry, who was and still is an expert farmer. He farmed the plantation for many years and is still farming part of it. The first parcel sold out of the plantation was in 1939, to Claude Harrison. The subdivision plat of Hardtimes Plantation was drawn by the Zigfried Company in 1937. The plat never was used except for the Claude Harrison sale.
In 1939, the corporation set aside a portion of Hardtimes as Biedenharn Estate Unit No. 1. During a period of 17 years, or until 1956, this subdivision of twenty lots was sold in five sales. Bayou DeSiard Country Club Estates Addition to Monroe was created out of the plantation in 1951. Subsequently, it was resubdivided so as to contain 70 lots, 68½ of which were sold between 1951 and 1966, in 64 separate sales. Oak Park Subdivision was created out of the plantation in 1954. It contains 164 lots, of which 104 were sold between 1954 and 1966. This includes both Unit No. 1 and Unit No. 2. Biedenharn Estates Unit No. 2 was established in 1960. Ten of the 15 lots therein were sold between 1960 and 1965. This was accomplished by 10 sales.[*]
These occurred as the City of Monroe expanded northward toward Hardtimes Plantation, and during this development the taxpayer sold lots for homesites. The Oak Park Addition, the Bayou DeSiard Country Club Addition, and Biedenharn Estates Unit No. 2 were improved and developed before lots were sold. These *1333 improvements included sewerage, engineering, streets, and water. The company expended a total of $56,879.12 on its Bayou DeSiard Country Club Addition; a total of $141,579.25 on its Oak Park Addition, and a total of $9,519.17 on its Biedenharn Estates Unit No. 2 subdivision.
In 1925, the taxpayer acquired property denominated as Owens' Factory Site, which was to provide a location for an Owens-Illinois Glass Plant. This would have been a convenient source of obtaining bottles for the Biedenharn's Monroe Coca-Cola plant. Later, this site was subdivided and dedicated as Biedenharn's Addition because plans for construction of the glass plant never materialized. Improvements were made and lots were sold by taxpayer from its Owens Factory Site. This, of course, did not occur during the years in question in this action, but is relevant to some extent in showing continuity of sales of land plots by taxpayer.
Its officers testified that the taxpayer itself did not advertise the property for sale, but that individuals seeking such desirable property would contact them and inquire whether or not it was for sale. The company sold several lots in this manner. It took no more than fifteen minutes to completely handle a sale, which normally was consummated by telephone with documentary transfers being handled by the company's legal counsel. Henry Biedenharn, Jr., testified that he spent about 10% of his time on the affairs of Biedenharn Realty Company. His primary duties involved collecting rents and maintaining rental property. The tax returns show that the gains from the sale of Hardtimes lots contributed only 11.1% to the company's gross income during the years involved in this suit.
Taxpayer has turned over subdivisions to independent contractors to sell three times. Oak Park Subdivision Unit No. 2 was handled by Faulk & Foster, and Oak Park Subdivision No. 1 was handled by Mr. Herbert Rosenhein. The Trentman Company of Fort Worth was engaged to dispose of the Owens tract many years prior to the taxable period in question here. The only control exercised over Rosenhein (representing taxpayer as a realtor) was that the taxpayer determined the selling price and, of course, executed the deed after all the papers and documents had been prepared. This was essentially the same arrangement taxpayer had with Faulk. Both brokers sold on a commission basis.
Taxpayer's income during the years in question was derived from stocks, bonds, farming operations, rentals, royalties, and the sale of subdivided lots. Taxpayer filed timely federal income tax returns disclosing these sales, and on these three income tax returns, it included its profit on real estate sales as 60% ordinary income and 40% capital gains. Subsequently, additional income taxes and interest were assessed against and collected under protest from the taxpayer by the Internal Revenue Service on the ground that profits earned by taxpayer from sales of subdivided lots, which were developed and improved by taxpayer, should be treated solely as ordinary income. Taxpayer filed claims for refunds, claiming that the sales profit should be treated as capital gains and not ordinary income. These claims were disallowed, and this action ensued.
The Government's position basically rests on two grounds: 1) The Government contends that subdividing the property and spending monies in developing and improving the property indicate that the lots sold were held for sale to customers primarily in the ordinary course of business; and, 2) additionally contends that the most important factor to be considered is the number, continuity, and frequency of sales by taxpayer. The Government concludes that this is not a case of mere occasional sales made in liquidation of a large landholding but instead is a case showing a continuous, annual, regular, and recurring pattern of selling and developing inventories of lots. *1334 Of course, the Government buttresses its position with other factors which it believes indicate that taxpayer held these lots primarily for sale to customers in the ordinary course of business: the taxpayer employed an individual or firm to sell the lots; the lots were advertised for sale, whether by taxpayer or its broker; there were restrictions in the deeds and plats limiting construction to single-family residences of at least 60% masonry construction, with a minimum area of at least 1200 square feet, and taxpayer dedicated portions of the three subdivided and improved properties as streets for public use.
The fact that these properties were subdivided and improved does not, in and of itself, require the conclusion that this land was held primarily for sale to customers in the ordinary course of business. In Barrios' Estate v. Commissioner of Internal Revenue, 265 F.2d 517 (5th Cir., 1959), the Fifth Circuit stated the following:
"The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water. It is hardly conceivable that taxpayer could have sold a lot without doing these things. To contend that reasonable expenditures and efforts, in such necessary undertakings are not entitled to capital gains treatment is to reject entirely the established principle that a person holding lands under such circumstances may subdivide it for advantageous sale." At p. 520.
This decision was cited approvingly in United States v. Winthrop, supra.
The facts to be considered in determining whether profits derived from the sale of land are capital gains or ordinary income are: "(1) The nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort [that] the taxpayer habitually devoted to the sales." United States v. Winthrop, supra, 417 F.2d at page 910, citing Smith v. Dunn, 224 F.2d 353 (5th Cir., 1955). See also, Hansche v. C. I. R., 457 F.2d 429 (9th Cir., 1972); Huxford v. United States, 441 F.2d 1371 (5th Cir., 1971); Myers v. United States, 345 F.Supp. 197 (N.D.Miss., 1972).
However, these tests "in and of themselves . . . have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety to determine whether or not the property involved was held primarily for sale in the ordinary course of business." Cole v. Usry, 294 F.2d 426, 427 (5th Cir., 1961), citing 3B Mertens' Law of Federal Income Taxation § 22.138, at p. 623.
Here there is no actual disagreement concerning the facts. The Government adduced no evidence in its behalf and contented itself with cross-examination of those witnesses presented by plaintiff. The only disagreement between the parties is whether the finding of ultimate fact should be that the land was primarily for sale in the ordinary course of taxpayer's business.
We are compelled to construe narrowly the definition of a capital asset, and as a corollary interpret its definition of exclusions broadly. United States v. Winthrop, supra. The first issue we consider is whether taxpayer held the property "primarily for sale," as that phrase is used in § 1221. The Supreme Court in Malat v. Ridell, 383 U.S. 569, 86 S.Ct. *1335 1030, 16 L.Ed.2d 102 (1966), held that "primarily" means "of first importance" or "principally" as used in § 1221(1).
We find, without doubt, that taxpayer acquired Hardtimes Plantation as an investment in 1935. The Government has not contended seriously otherwise. It is uncontradicted that this property was farmed, leased for farming, and substantial parts of it are still farmed. Within the first fifteen years after acquisition of the property, there had been only six separate sales of portions of it. These facts, together with the uncontradicted stated purpose for which it was acquired, establish that this property was acquired as an investment by taxpayer. As noted, parts of the plantation are still farmed, and thus the duration of ownership has been over an extended period of nearly forty years, although parts of it have been sold. Therefore, we conclude the evidence to be clear and uncontradicted that taxpayer acquired this property as an investment.
However, what once was an investment or what may start out as a liquidation of an investment may become something else. Ackerman v. United States, 335 F.2d 521 (5th Cir., 1964); Thompson v. C. I. R., 322 F.2d 122 (5th Cir., 1963). In the taxable years in question, taxpayer sold 38 Lots through 37 sales, either on its own or through brokers. In a three-year period, this amounts to approximately 1 sale a month; although this is not a large volume of sales, one still may be considered holding property primarily for sale in the ordinary course of business if the continuity of the sales over a long time is such that it will indicate that the seller is a dealer in real estate. The converse is also true. The Fifth Circuit declared in Ross v. Commissioner, 227 F.2d 265 (5th Cir., 1955):
"The argument of the Commissioner with respect to the volume and frequency of sales here is also answered by the Goldberg case [223 F.2d 713]. The Commissioner here leaned heavily upon the fact that more than 80% of the houses owned by the taxpayer were sold in one year and at a profit of more than $58,000. The answer we gave there was that the corporation had a lot of houses to sell: `The sales were frequent and continuous; but since the circumstances were favorable to selling to individuals and the project was a large one, this is entirely consistent with liquidation of it as an investment . . . . There was absolutely no evidence of any promotional activity or that petitioners used the proceeds to buy and sell other houses. . . .'" At p. 268.
Consequently, the conclusion we feel compelled to reach from the evidence presented is that 1) taxpayer had made a large acquisition of land, which was farmed; 2) the City of Monroe expanded northward; 3) the demand for property became greater; and 4) these factors caused the land to appreciate in value and taxpayer decided to liquidate part of its holdings. It made these holdings more attractive by development and improvement. Thus the evidence is clear that the lots were not held by Biedenharn principally or primarily for sale as that phrase was interpreted by the Supreme Court in Malat, supra.
Even if we considered the lots to be held primarily for sale to customers in the ordinary course of business taxpayer must meet one more test to be denied capital gains treatment because "holding primarily for sale . . . is by itself insufficient to disqualify the taxpayer from capital gains privileges. The sales must also be made in the ordinary course of taxpayer's trade or business. The next issue, therefore, is whether the taxpayer's activities constituted a trade or business."
Although subdividing and developing were more than normal, no advertising was done by taxpayer. Testimony is to the effect that those persons wanting *1336 lots inquired of taxpayer as to its willingness to sell them. It, therefore, solicited no sales. The brokers employed by taxpayer (one during the taxable years in question, and the other approximately ten years previously) advertised in the newspapers generally and by placing signs on the property indicating that lots were for sale.
Taxpayer exerted almost no control whatever over the representative selling the property in question. The only control or supervision exercised was that of establishing the price of the property being sold and the signing of the deed. The representative worked on a commission, and he testified that the taxpayer did not in any way control his selling activities.
Biedenharn Realty has no separate office from that of the President's office in the Coca-Cola Bottling Plant. The only use of this office for selling activities was that of utilizing the telephone to negotiate, and the deeds possibly were signed in this office.
The officers of the company have testified that they spent a minimal amount of their time selling the property and almost no effort. Sales of this property constituted approximately 10% of taxpayer's gross income during the years in question. Although one may be a dealer in real estate where no office is used, no brokers are employed, no time has been spent promoting sales, and no advertising has been used, one still must be in the business of selling lots to lose his right to capital gains treatment of profits from sales of lots. Winthrop, supra. Here sales were not ordinary in the course of taxpayer's business. Taxpayer did not begin selling shortly after it acquired the land; instead it farmed the land for years, and is still farming a large part of the land; and even though lots have been sold over a number of years, the circumstances indicate that such was not "in the ordinary course" of taxpayer's business. Sales of lots were not the sole object of taxpayer's business, nor did they approximate even a substantial part of taxpayer's activities. There was no singleness of purpose here, thus this case is outside the category of Winthrop, supra. Rather, this factual situation tends to gravitate heavily toward the rules established in Barrios' Estate, supra; Ross, supra; Consolidated Naval Stores Co. v. Fahs, 227 F.2d 923 (5th Cir., 1955); Goldberg v. Commissioner of Internal Revenue, 223 F.2d 709 (5th Cir., 1955). Here the property has been used for other purposes and still is being used for such. Taxpayer is merely liquidating over a long period of time a substantial investment in the most advantageous method possible.
Consequently, we must and do find as an ultimate fact, and conclude that, the property held by taxpayer was not held primarily for sale to customers in the ordinary course of its trade or business. Therefore, judgment will be granted in favor of plaintiff, allowing its claimed refund with interest.
Counsel will prepare an appropriate order pursuant to our Local Rule 9.

*1337
 PLAINTIFF'S EXHIBIT # 2
 SALES OF LOTS FROM
 HARDTIMES PLANTATION SUBDIVISIONS
 Biedenharn Est. Bayou DeSiard Ctry. Oak Park Subd. Biedenharn Oak Park Subd. TOTAL NO. TOTAL
 Unit No. 1 Club Est. Add'n to Unit No. 1 Estates Unit No. 2 OF LOTS NO. OF
 Monroe Unit No. 2 SOLD SALES[[**]]
 --------------- ------------------- -------------- ---------- -------------- --------- --------------
1935 0 0 0 0 0 0
1936 0 0 0 0 0 0
1937 0 0 0 0 0 0
1938 0 0 0 0 0 0
1939 4 (1 sale) 0 0 0 4 1
1940 1 0 0 0 1 1
1941 2 (1 sale) 0 0 0 2 1
1942 3 (1 sale) 0 0 0 3 1
1943 0 0 0 0 0 0 0
1944 0 0 0 0 0 0 0
1945 0 0 0 0 0 0 0
1946 0 0 0 0 0 0 0
1947 1 0 0 0 0 1 1
1948 7 (1 sale) 0 0 0 0 7 1
1949 0 0 0 0 0 0 0
1950 0 0 0 0 0 0 0
1951 0 10 (8 sales) 0 0 0 10 8
1952 0 7 0 0 0 7 7
1953 0 13 0 0 0 13 13
1954 0 5 (3 sales) 0 0 0 5 3
1955 0 9-1/2 (4 sales) 3 (2 sales) 0 0 12-1/2 6
1956 2 (1 sale) 5 12-1/2 (8 sales) 0 0 19-1/2 14
1957 0 5 30-1/2 (18 sales) 0 0 35-1/2 23
1958 0 5 17-1/4 (12 sales) 0 0 22-1/4 17
1959 0 1 11 (7 sales) 0 0 12 8
1960 0 6 0 5 0 11 11
1961 0 0 0 2 0 2 2
1962 0 0 0 1 0 1 1
1963 0 0 0 0 1 1 1
 Bayou DeSiard Ctry.
 Club Add'n Resub.
 of Lots 43 thru 49
 -------------------
1964 0 2 0 1 7 10 10
1965 0 2 0 1 5 8 8
1966 0 3 0 0 17 (16 sales) 20 19

NOTES
[*] See Plaintiff's Exhibit #2, photocopy attached.
[**] This column supplied by the Court.