**BIEDENHARN REALTY COMPANY, INC., Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 73–3690.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1976.

Scott P. Crampton, Asst. Atty. Gen., William A. Friedlander, Atty., Tax Div., Dept. of Justice, Washington, D. C., Donald E. Walter, U. S. Atty., Shreveport, La., Fleming T. de Graffenried, Tax Div., Dept. of Justice, Dallas, Tex., William A. Whitledge, Atty., Meyer Rothwacks, Chief, Appellate Sec., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Paul K. Kirkpatrick, Jr., John C. Blackman, Nauman S. Scott, III, Monroe, La., for plaintiff-appellee.

J. Robertshaw, Greenville, Miss., amicus curiae.

Before WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY and GEE, Circuit Judges.*

GOLDBERG, Circuit Judge:

The taxpayer-plaintiff, Biedenharn Realty Company, Inc. [Biedenharn], filed suit against the United States in May, 1971, claiming a refund for the tax years 1964, 1965, and 1966. In its original tax returns for the three years, Biedenharn listed profits of $254,409.47 from the sale of 38 residential lots. Taxpayer divided this gain, attributing 60% to ordinary income and 40% to capital gains.[1] Later, having determined that the profits from these sales were entirely ordinary income, the Internal Revenue Service assessed and collected additional taxes and interest. In its present action, plaintiff asserts that the whole real estate profit represents gain from the sale of capital assets and consequently that the Government is indebted to taxpayer for $32,006.86 in overpaid taxes. Reviewing the facts of this case in the light of our previous holdings and the directions set forth in this opinion, we reject plaintiff's claim and in so doing reverse the opinion of the District Court.

## I.

Because of the confusing state of the record in this controversy and the resulting inconsistencies among the facts as stipulated by the parties, as found by the District Court,[2] and as stated in the panel opinion,[3] we believe it useful to set out in plentiful detail the case's background and circumstances as best they can be ascertained.

A. *The Realty Company.* Joseph Biedenharn organized the Biedenharn Realty Company in 1923 as a vehicle for holding and managing the Biedenharn family's numerous investments. The original stockholders were all family members.[4] The investment company

---

* Chief Judge Brown took no part in the consideration or decision of this case.

1. A letter attached by the Realty Company to its tax forms in each year 1964–1966 suggests that the original 60/40 division represents the figures governing settlement of pre–1964 litigation between Biedenharn and the Internal Revenue Service. That settlement is not in issue here, and neither party to this controversy suggests that the previous suit has any impact on the present proceedings.

2. *Biedenharn Realty Co. v. United States,* 356 F.Supp. 1331 (W.D.La.1973).

3. *Biedenharn Realty Co. v. United States,* 5 Cir. 1975, 509 F.2d 171

4. Currently, B. W. Biedenharn is President of the Realty Company. Henry Biedenharn serves as Biedenharn's Vice-President/Manager.

controls, among other interests, valuable commercial properties, a substantial stock portfolio, a motel, warehouses, a shopping center, residential real property, and farm property.

B. *Taxpayer's Real Property Sales—The Hardtimes Plantation.* Taxpayer's suit most directly involves its ownership and sale of lots from the 973 acre tract located near Monroe, Louisiana, known as the Hardtimes Plantation. The plaintiff purchased the estate in 1935 for $50,000.00. B. W. Biedenharn, the Realty Company's president, testified that taxpayer acquired Hardtimes as a "good buy" for the purpose of farming and as a future investment. The plaintiff farmed the land for several years. Thereafter, Biedenharn rented part of the acreage to a farmer who Mr. Biedenharn suggested may presently be engaged in farming operations.[5]

1. *The Three Basic Subdivisions.* Between 1939 and 1966, taxpayer carved three basic subdivisions from Hardtimes—Biedenharn Estates, Bayou DeSiard Country Club Addition, and Oak Park Addition—covering approximately 185 acres.[6] During these years, Biedenharn sold 208 subdivided Hardtimes lots in 158 sales, making a profit in excess of $800,000.00. These three basic subdivisions are the source of the contested 37 sales of 38 lots.[7] Their development and disposition are more fully discussed below.

a) Biedenharn Estates Unit 1, including 41.9 acres, was platted in 1938. Between 1939 and 1956, taxpayer apparently sold 21 lots in 9 sales.[8] Unit 2, containing 8.91 acres, was sold in 9 transactions between 1960 and 1965 and involved 10 lots.

b) Bayou DeSiard Country Club Addition, covering 61 acres, was subdivided in 1951, with remaining lots resubdivided in 1964. Approximately 73 lots were purchased in 64 sales from 1951 to 1966.[9]

c) Oak Park Units 1 and 2 encompassed 75 acres. After subdivision in 1955 and resubdivision in 1960, plaintiff sold approximately 104 lots in 76 sales.

2. *Additional Hardtimes Sales.* Plaintiff lists at least 12 additional Hardtimes sales other than lots vended from the three basic subdivisions. The earliest of these dispositions occurred in November, 1935, thirteen days after the Plantation's

---

5. *See* note 43 *infra.*

6. In 1938, A. G. Siegfried, Inc., prepared a plat for all of the Hardtimes Plantation. B. W. Biedenharn testified that he thought that this particular plat was used only for a single 1939 sale. However, a copy of the blueprint read in conjunction with plaintiff's answers to interrogatories indicates that the Siegfried plat formed the basis for the entire first Biedenharn subdivision, Biedenharn Estates Unit 1, from which the Realty Company eventually sold 21 lots.

Examination of the record reveals other instances of confusion and inconsistency among the plaintiff's interrogatories, exhibits, briefs, and testimony with respect to dates, numbers of sales and lots, and subdivision activity. *See, e. g.,* notes 8, 10, 11, 12, 18, 19 *infra.*

7. The 37 sales (1964–1966) break down as follows:

Biedenharn Estates Unit 2    2
Bayou DeSiard Country Club Addition    7
Oak Park Addition    28 (29 lots)

In 1965, Biedenharn effected the sale of two additional properties, the Keller house and lot and 1.958 acres from Hardtimes. These sales are not in controversy here. All subdivisions except Biedenharn Estates Unit 1 are restricted to single family residences of at least 60% masonry construction and of not less than 1200 square feet exclusive of porches and carports.

8. Plaintiff's exhibit 2, reprinted at 356 F.Supp. 1331, 1337, enumerates twenty lots sold in seven transactions from Biedenharn Estates Unit 1. The District Court, perhaps misreading the chart, found only five transactions. *Supra* at 1332. Plaintiff's answers to interrogatories, apparently inconsistent with their exhibit 2 and with the District Court's finding, lists nine sales of 21 lots. Whatever the accurate factual resolution, any differences among the numbers are not so great as to alter our conclusions in the present case.

9. Plaintiff's exhibit 2 and answer to interrogatories specify 73½ lots and 64 sales. The District Court found 68½ lots sold in 64 transactions.

purchase. Ultimately totaling approximately 275 acres, most, but not all, of these sales involved large parcels of non-subdivided land.

C. *Taxpayer's Real Property Activity: Non-Hardtimes Sales.* The 208 lots marketed from the three Hardtimes subdivisions represent only part of Biedenharn's total real property sales activities. Although the record does not in every instance permit exactitude, plaintiff's own submissions make clear that the Biedenharn Realty Company effectuated numerous non-Hardtimes retail real estate transactions. From the Company's formation in 1923 through 1966, the last year for which taxes are contested, taxpayer sold 934 lots. Of this total, plaintiff disposed of 249 lots before 1935 when it acquired Hardtimes. Thus, in the years 1935 to 1966, taxpayer sold 477 lots apart from its efforts with respect to the basic Hardtimes subdivisions. Biedenharn's year by year sales breakdown is attached as Appendix I of this opinion. That chart shows real estate sales in all but two years, 1932 and 1970, since the Realty Company's 1923 inception.[10]

Unfortunately, the record does not unambiguously reveal the number of *sales* as opposed to the number of *lots* involved in these dispositions. Although some doubt exists as to the actual *sales* totals, even the most conservative reading of the figures convinces us of the frequency and abundance of the non-Hardtimes sales.[11] For example, from 1925 to 1958, Biedenharn consummated from its subdivided Owens tract a minimum of 125, but perhaps upwards of 300, sales (338 lots).[12] Eighteen sales accounted for 20 lots sold between 1923 and 1958 from Biedenharn's Cornwall property. Taxpayer's disposition from 1927 to 1960 of its Corey and Cabeen property resulted in at least 50 sales. Plaintiff made 14 sales from its Thomas Street lots between 1937 and 1955. Moreover, Biedenharn has sold over 20 other properties, a few of them piece-meal, since 1923.

Each of these parcels has its own history. Joseph Biedenharn transferred much of the land to the Realty Company in 1923. The company acquired other property through purchases and various forms of foreclosure. Before sale, Biedenharn held some tracts for commercial or residential rental. Taxpayer originally had slated the Owens acreage for transfer in bulk to the Owens-Illinois Company. Also, the length of time between acquisition and disposition differed significantly among pieces of realty. However, these variations[13] in the

---

**10.** The plaintiff's answer to interrogatory 26 [Appendix I] indicates 1,095 lots sold between 1923 and 1971. The record does not permit correlation of the interrogatory 26 figures with the individual lot and sales breakdowns provided for each tract of land. However, when the Government questioned Henry Biedenharn about the correctness of the figures, plaintiff's attorney intervened to stipulate to their accuracy. Interrogatory 26 further indicates that from these 1,095 lots sold, plaintiff realized a net profit of $1,509,860.25 on gross sales of $2,045,418.19. We are not told the extent to which taxpayer received capital gains treatment with respect to these sales. *But see* note 1 *supra.*

**11.** In reviewing the interrogatory 26 numbers, *see* note 10 *supra,* we have kept in mind that single sales in 1947, 1971, and perhaps other years, *see also* note 12 *infra,* accounted for large numbers of the lots disposed in those

years. Notwithstanding the difficulty such multiple lot sales create in accurately evaluating the numbers, the record easily evidences sufficient *individual* sales of single lots to support our determination with respect to the frequency and substantiality of Biedenharn's real estate activities.

**12.** On its individual sales breakdown sheet for the Owens tract, taxpayer provided only gross lot figures for the period before 1930. As a result, it is uncertain, for example, whether taxpayer's answer that in 1925 "17 *lots*" were marketed from that subdivision indicates 1, 17, or some intermediate number of *sales* in that year. As noted above, taking the most conservative view and considering these lumped figures as single sales, the Owens property accounts for at least 125 separate sales.

**13.** Of the four non-Hardtimes tracts specifically mentioned above, three were capital contributions from J. A. Biedenharn. The Thomas

background of each plot and the length of time and original purpose [14] for which each was obtained do not alter the fact that the Biedenharn Realty Company regularly sold substantial amounts of subdivided and improved real property, and further, that these sales were not confined to the basic Hardtimes subdivisions.[15]

D. *Real Property Improvements.* Before selling the Hardtimes lots, Biedenharn improved the land, adding in most instances streets, drainage, water, sewerage, and electricity. The total cost of bettering the Plantation acreage exceeded $200,000 and included $9,519.17 for Biedenharn Estates Unit 2,[16] $56,879.12 for Bayou DeSiard County Club Addition, and $141,579.25 for the Oak Park Addition.

E. *Sale of the Hardtimes Subdivisions.* Bernard Biedenharn testified that at the time of the Hardtimes purchase, no one foresaw that the land would be sold as residential property in the future.

Accordingly, the District Court found, and we do not disagree, that Biedenharn bought Hardtimes for investment. Later, as the City of Monroe expanded northward, the Plantation became valuable residential property. The Realty Company staked off the Bayou DeSiard subdivision so that prospective purchasers could see what the lots "looked like." As demand increased, taxpayer opened the Oak Park and Biedenharn Estates Unit 2 subdivisions and resubdivided the Bayou DeSiard section. Taxpayer handled all Biedenharn Estates and Bayou DeSiard sales.[17] Independent realtors disposed of many of the Oak Park lots. Mr. Herbert Rosenhein, a local broker, sold Oak Park Unit 1 lots. Gilbert Faulk, a real estate agent, sold from Oak Park Unit 2. Of the 37 sales consummated between 1964 and 1966, Henry Biedenharn handled at least nine transactions (Biedenharn Estates (2) and Bayou DeSiard (7)) while "independent realtors" effected some, if not all, of the other 28 transactions (Oak Park Unit 2.).[18] Taxpayer delegated significant re-

---

Street lots were acquired through the purchase of distressed paving certificates. Prior owners subdivided the Thomas and Cornwall properties although Biedenharn Realty improved the latter land with streets and drainage. Previous owners also originally platted the Corey and Cabeen property, but plaintiff later further platted part of this tract. Three dwellings comprised plaintiff's Corey and Cabeen improvements. Taxpayer platted the Owens site and added improvements including streets and drainage.

14. The Government nowhere contends that the Realty Company acquired any of these properties with the initial intention of subdivision and resale.

15. The District Court briefly discussed the history of the Owens tract, 356 F.Supp. at 1333, but did not really make findings with respect to the non-Hardtimes sales. The panel opinion observed "it is fair to say it [Biedenharn] does not have a significant history of acquiring and subdividing other tracts of land." 509 F.2d at 172. Although in some instances prior owners undertook the original platting, *see* note 13 *supra,* we stand by our analysis above and its conclusion that Biedenharn had substantial and frequent non-Hardtimes sales.

16. Taxpayer recorded the cost of improving Biedenharn Estates Unit 1 (only streets) as "unknown."

17. The panel opinion, 509 F.2d at 173, erroneously suggests that independent agents took charge of all sales.

18. The 9/28 division for the 1964–1966 sales comes from plaintiff's brief. However, Mr. Faulk, the only agent listed in taxpayer's answer to interrogatories as having sold Oak Park Unit 2 properties, testified that the Realty Company hired him only in 1965. A memorandum prepared by Faulk immediately after Biedenharn had engaged the former's services, is dated November 22, 1965. Presumably, some one other than Mr. Faulk, perhaps Henry Biedenharn, handled the eleven lots listed in plaintiff's answer as having been sold from Oak Park before November, 1965. If so, Mr. Biedenharn would have sold eleven Oak Park lots as well as nine lots from the other subdivisions, leaving only 18 pre-1967 sales attributable to the independent broker, Mr. Faulk. An additional inconsistency arises from Plaintiff's Proposed Findings of Fact wherein taxpayer states that "24 of those [the thirty-seven 1964–1966] sales were made by independent agents." Similarly confusion appears in the

sponsibilities to these brokers. In its dealings with Faulk, Biedenharn set the prices, general credit terms, and signed the deeds. Details, including specific credit decisions and advertising, devolved to Faulk, who utilized on-site signs and newspapers to publicize the lots.

In contrast to these broker induced dispositions, plaintiff's non-brokered sales [19] resulted after unsolicited individuals approached Realty Company employees with inquiries about prospective purchases. At no time did the plaintiff hire its own real state salesmen or engage in formal advertising. Apparently, the lands' prime location and plaintiff's subdivision activities constituted sufficient notice to interested persons of the availability of Hardtimes lots. Henry Biedenharn testified:

[O]nce we started improving and putting roads and streets in people would call us up and ask you about buying a lot and we would sell a lot if they wanted it.

The Realty Company does not maintain a separate place of business but instead offices at the Biedenharn family's Ouachita Coca-Cola bottling plant. A telephone, listed in plaintiff's name, rings at the Coca-Cola building. Biedenharn has four employees: a camp caretaker, a tenant farmer, a bookkeeper and a manager. The manager, Henry Biedenharn, Jr., devotes approximately 10% of his time to the Realty Company, mostly collecting rents and overseeing the maintenance of various properties. The bookkeeper also works only part-time for plaintiff. Having set out these facts, we

now discuss the relevant legal standard for resolving this controversy.

## II.

The determination of gain as capital or ordinary is controlled by the language of the Internal Revenue Code. The Code defines capital asset, the profitable sale or exchange of which generally results in capital gains, as "property held by the taxpayer." 26 U.S.C. § 1221. Many exceptions limit the enormous breadth of this congressional description and consequently remove large numbers of transactions from the privileged realm of capital gains. In this case, we confront the question whether or not Biedenharn's real estate sales should be taxed at ordinary rates because they fall within the exception covering "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. § 1221(1).[20]

The problem we struggle with here is not novel. We have become accustomed to the frequency with which taxpayers litigate this troublesome question. Chief Judge Brown appropriately described the real estate capital gains-ordinary income issue as "old, familiar, recurring, vexing and ofttimes elusive." *Thompson v. Commissioner of Internal Revenue,* 5 Cir. 1963, 322 F.2d 122, 123. The difficulty in large part stems from ad-hoc application of the numerous permissible criteria set forth in our multitudinous prior opinions.[21] Over the past 40 years, this case by case approach with its concentration on the facts of each suit has resulted in a collection of decisions not always rec-

record as to who sold certain portions of the Oak Park Unit 1 properties.

19. The record is not clear, but it appears that the Trentman Company, realtors, made the initial sales from the Owens tract (1925) and that thereafter, with the exception of Oak Park, discussed above, all Biedenharn sales were managed exclusively by the Realty Company.

20. Neither party contends, nor do we find, that Internal Revenue Code § 1237, guaranteeing capital gains treatment to subdividing taxpayers in certain instances, is applicable to the facts of this suit.

21. One finds evidence of the vast array of opinions and factors discussed therein by briefly perusing the 24 small-type, double column pages of Prentice-Hall's *Federal Taxation* ¶ 32,486 which lists the cases involving subdivided realty. *See also* 33 Mertens, *The Law of Federal Income Taxation* §§ 22.138–22.142 (Malone Rev.). The Second Circuit has called these judicial pronouncements "legion." *Gault v. Commissioner of Internal Revenue,* 2 Cir. 1964, 332 F.2d 94, 95.

oncilable. Recognizing the situation, we have warned that efforts to distinguish and thereby make consistent the Court's previous holdings must necessarily be "foreboding and unrewarding." *Thompson, supra* at 127. *See Williams v. United States,* 5 Cir. 1964, 329 F.2d 430, 431. Litigants are cautioned that "each case must be decided on its own peculiar facts. * * * Specific factors, or combinations of them are not necessarily controlling." *Thompson, supra* at 127; *Wood v. Commissioner of Internal Revenue,* 5 Cir. 1960, 276 F.2d 586, 590; *Smith v. Commissioner of Internal Revenue,* 5 Cir. 1956, 232 F.2d 142, 144. Nor are these factors the equivalent of the philosopher's stone, separating "sellers garlanded with capital gains from those beflowered in the garden of ordinary income." *United States v. Winthrop,* 5 Cir. 1969, 417 F.2d 905, 911.

Assuredly, we would much prefer one or two clearly defined, easily employed tests which lead to predictable, perhaps automatic, conclusions. However, the nature of the congressional "capital asset" definition and the myriad situations to which we must apply that standard make impossible any easy escape from the task before us. No one set of criteria is applicable to all economic structures. Moreover, within a collection of tests, individual factors have varying weights and magnitudes, depending on the facts of the case. The relationship among the factors and their mutual interaction is altered as each criteria increases or diminishes in strength, sometimes changing the controversy's outcome. As such, there can be no mathe-

matical formula capable of finding the X of capital gains or ordinary income in this complicated field.

Yet our inability to proffer a panaceatic guide to the perplexed with respect to this subject does not preclude our setting forth some general, albeit inexact, guidelines for the resolution of many of the § 1221(1) cases we confront. This opinion does not purport to reconcile all past precedents or assure conflict-free future decisions. Nor do we hereby obviate the need for ad-hoc adjustments when confronted with close cases and changing factual circumstances. Instead, with the hope of clarifying a few of the area's mysteries, we more precisely define and suggest points of emphasis for the major *Winthrop* delineated factors [22] as they appear in the instant controversy. In so doing, we devote particular attention to the Court's recent opinions in order that our analysis will reflect, insofar as possible, the Circuit's present trends.

### III.

We begin our task by evaluating in the light of *Biedenharn*'s facts the main *Winthrop* [23] factors—substantiality and frequency of sales, improvements, solicitation and advertising efforts, and brokers' activities—as well as a few miscellaneous contentions. A separate section follows discussing the keenly contested role of prior investment intent. Finally, we consider the significance of the Supreme Court's decision in *Malat v. Riddell.* [24]

---

**22.** In *United States v. Winthrop,* 5 Cir. 1969, 417 F.2d 905, 910, the Court enumerated the following factors:

> (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control ex-

ercised by the taxpayer over any representative *selling the property; and* (7) the time and effort the taxpayer habitually devoted to the sales.

The numbering indicates no hierarchy of importance.

**23.** *See* note 22 *supra.* For purposes of this decision, we have resummarized the *Winthrop* factors as noted above.

**24.** 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966).

## A. Frequency and Substantiality of Sales

██ Scrutinizing closely the record and briefs, we find that plaintiff's real property sales activities compel an ordinary income conclusion.[25] In arriving at this result, we examine first the most important of *Winthrop*'s factors—the frequency and substantiality of taxpayer's sales. Although frequency and substantiality of sales are not usually conclusive, they occupy the preeminent ground in our analysis. The recent trend of Fifth Circuit decisions indicates that when dispositions of subdivided property extend over a long period of time and are especially numerous, the likelihood of capital gains is very slight indeed. *See United States v. Winthrop,* 5 Cir. 1969, 417 F.2d 905; *Thompson v. Commissioner of Internal Revenue,* 5 Cir. 1963, 322 F.2d 122. Conversely, when sales are few and isolated, the taxpayer's claim to capital gain is accorded greater deference. *Cf. Gamble v. Commissioner of Internal Revenue,* 5 Cir. 1957, 242 F.2d 586, 591; *Brown v. Commissioner of Internal Revenue,* 5 Cir. 1944, 143 F.2d 468, 470.

██ On the present facts, taxpayer could not claim "isolated" sales or a passive and gradual liquidation. *See Gamble, supra*; *Dunlap v. Oldham Lumber Company,* 5 Cir. 1950, 178 F.2d 781, 784; *Brown, supra.* Although only three years and 37 sales (38 lots) are in controversy here, taxpayer's pre-1964 sales from the Hardtimes acreage as well as similar dispositions from other properties are probative of the existence of sales "in the ordinary course of his trade or business." *See* Levin, *Capital Gains Or Income Tax on Real Estate Sales,* 37 B.U.L.Rev. 165, 170 & n.29 (1957). *Cf. Snell v. Commissioner of Internal Revenue,* 5 Cir. 1938, 97 F.2d 891. As Appendix I indicates, Biedenharn sold property, usually a substantial number of lots, in every year, save one, from 1923 to 1966. Biedenharn's long and steady history of improved lot sales at least equals that encountered in *Thompson v. Commissioner of Internal Revenue,* 5 Cir. 1963, 322 F.2d 122, where also we noted the full history of real estate activity.[26] *Supra* at 124–25. There taxpayer lost on a finding that he had sold 376½ lots over a 15 year span—this notwithstanding that overall the other sales indicia were more in taxpayer's favor than in the present case. Moreover, the contested tax years in that suit involved only ten sales (28 lots); yet we labeled that activity "substantial." *Supra* at 125.

The frequency and substantiality of Biedenharn's sales go not only to its holding purpose and the existence of a trade or business but also support our finding of the ordinariness with which the Realty Company disposed of its lots. These sales easily meet the criteria of normalcy set forth in *Winthrop, supra* at 912.

Furthermore, in contrast with *Goldberg v. Commissioner of Internal Revenue,* 5 Cir. 1955, 223 F.2d 709, 713, where taxpayer did not reinvest his sales proceeds, one could fairly infer that the income accruing to the Biedenharn Realty Company from its pre-1935 sales helped support the purchase of the Hardtimes Plantation. Even if taxpayer made no significant acquisitions after Hardtimes,[27] the "purpose, system, and

25. Our power to review the District Court's ultimate legal determination that taxpayer did not hold property "primarily for sale to customers in the ordinary course of his trade or business" is plenary and not limited by the clearly erroneous rule. *See United States v. Winthrop,* 5 Cir. 1969, 417 F.2d 905, 910; *Thomas v. Commissioner of Internal Revenue,* 5 Cir. 1958, 254 F.2d 233, 236. *See also United States v. Temple,* 5 Cir. 1966, 355 F.2d 67, 68 (Wisdom, J. dissenting).

26. Similarly, *see Winthrop, supra* at 907.

27. Plaintiff's answers to interrogatories indicate recent purchases of undeveloped realty including 2360 acres of timber land (1971), 3.7 acres at a proposed interstate highway intersection (1967), and a small lot adjacent to a shopping center (1968). Plaintiff also lists a number of other post-1935 acquisitions, many of which are still held by the Realty Company.

continuity" of Biedenharn's efforts easily constitute a business. *See Snell, supra* at 893; *Brown, supra* at 470. As we said in *Snell, supra* :

> The fact that he bought no additional lands during this period does not prevent his activities being a business. He merely had enough land to do a large business without buying any more.

Citing previous Fifth Circuit decisions including *Goldberg v. Commissioner of Internal Revenue,* 5 Cir. 1955, 223 F.2d 709, 713, and *Ross v. Commissioner of Internal Revenue,* 5 Cir. 1955, 227 F.2d 265, 268, the District Court sought to overcome this evidence of dealer-like real estate activities and property "primarily held for sale" by clinging to the notion that the taxpayer was merely liquidating a prior investment. We discuss later the role of former investment status and the possibility of taxpayer relief under that concept. Otherwise, the question of liquidation of an investment is simply the opposite side of the inquiry as to whether or not one is holding property primarily for sale in the ordinary course of his business. In other words, a taxpayer's claim that he is liquidating a prior investment does not really present a separate theory but rather restates the main question currently under scrutiny. To the extent the opinions cited by the District Court might create a specially protected "liquidation" niche,[28] we believe that the present case, with taxpayer's energetic subdivision activities and consummation of numerous retail property dispositions, is governed by our more recent decision in *Thompson v. Commissioner of Internal Revenue, supra* at 127–28. There, the Court observed:

> The liquidation, if it really is that, may therefore be carried out with business efficiency. *Smith v. Commissioner of Internal Revenue,* 5 Cir. 1956, 232 F.2d 142, 145. But what was once an investment, or what may start out as a liquidation of an investment, may become something else. The Tax

Court was eminently justified in concluding that this took place here. It was a regular part of the trade or business of Taxpayer to sell these lots to any and all comers who would meet his price. From 1944 on when the sales commenced, there is no evidence that he thereafter held the lots for any purpose other than the sale to prospective purchasers. It is true that he testified in conclusory terms that he was trying to "liquidate" but on objective standards the Tax Court could equate held solely with "held primarily." And, of course, there can be no question at all that purchasers of these lots were "customers" and that whether we call Taxpayer a "dealer" or a "trader", a real estate man or otherwise, the continuous sales of these lots down to the point of exhaustion was a regular and ordinary (and profitable) part of his business activity.

*See Ackerman v. United States,* 5 Cir. 1964, 335 F.2d 521, 524–25; *Brown, supra* at 470.

### B. *Improvements*

Although we place greatest emphasis on the frequency and substantiality of sales over an extended time period, our decision in this instance is aided by the presence of taxpayer activity—particularly improvements—in the other *Winthrop* areas. Biedenharn vigorously improved its subdivisions, generally adding streets, drainage, sewerage, and utilities. These alterations are comparable to those in *Winthrop, supra* at 906, except that in the latter case taxpayer built five houses. We do not think that the construction of five houses in the context of *Winthrop*'s 456 lot sales significantly distinguishes that taxpayer from Biedenharn. In *Barrios Estate v. Commissioner of Internal Revenue,* 5 Cir. 1959, 265 F.2d 517, 520, heavily relied on by plaintiff, the Court reasoned that improvements constituted an integral part of the sale of subdivided realty and were therefore permissible in the context of a liquidating sale. As discussed above,

28. *See* section IV *infra.*

Biedenharn's activities have removed it from any harbor of investment liquidation. Moreover, the additional sales flexibility permitted the *Barrios Estate* taxpayer might be predicated on the forced change of purpose examined in section IV. Finally, in *Thompson, supra,* the plaintiff's only activities were subdivision and improvement. Yet, not availing ourselves of the opportunity to rely on a *Barrios Estate* type "liquidation plus integrally related improvements theory," we found no escape from ordinary income.

### C. Solicitation and Advertising Efforts

Substantial, frequent sales and improvements such as we have encountered in this case will usually conclude the capital gains issue against taxpayer. *See, e. g., Thompson, supra.* Thus, on the basis of our analysis to this point, we would have little hesitation in finding that taxpayer held "primarily for sale" in the "ordinary course of [his] trade or business." "[T]he flexing of commercial muscles with frequency and continuity, design and effect" of which *Winthrop* spoke, *supra* at 911, is here a reality. This reality is further buttressed by Biedenharn's sales efforts, including those carried on through brokers.[29] Minimizing the importance of its own sales activities, taxpayer points repeatedly to its steady avoidance of advertising or other solicitation of customers. Plaintiff directs our attention to stipulations detailing the population growth of Monroe and testimony outlining the economic forces which made Hardtimes Plantation attractive residential property and presumably eliminated the need for sales exertions. We have no quarrel with plaintiff's description of this familiar process of suburban expansion, but we cannot accept the legal inferences which taxpayer would have us draw.

▃ The Circuit's recent decisions in *Thompson, supra* at 124–26, and *Winthrop, supra* at 912, implicitly recognize that even one inarguably in the real estate business need not engage in promotional exertions in the face of a favorable market. As such, we do not always require a showing of active solicitation where "business . . . [is] good, indeed brisk," *Thompson, supra* at 124, and where other *Winthrop* factors make obvious taxpayer's ordinary trade or business status. *See also* Levin, *supra* at 190. Plainly, this represents a sensible approach. In cases such as *Biedenharn,* the sale of a few lots and the construction of the first homes, albeit not, as in *Winthrop,* by the taxpayer, as well as the building of roads, addition of utilities, and staking off of the other subdivided parcels constitute a highly visible form of advertising. Prospective home buyers drive by the advantageously located property, see the development activities, and are as surely put on notice of the availability of lots as if the owner had erected large signs announcing "residential property for sale."[30] We do not by this evaluation automatically neutralize advertising or solicitation as a factor in our analysis. This form of inherent notice is not present in all land sales, especially where the property is not so valuably located, is not subdivided into small lots, and is not improved. Moreover, inherent notice represents only one band of the solicitation spectrum. Media utilization and personal initiatives remain material components of this criterion. When present, they call for greater Government oriented emphasis on *Winthrop*'s solicitation factor.

### D. Brokerage Activities

In evaluating Biedenharn's solicitation activities, we need not confine ourselves to the *Thompson-Winthrop* theory of brisk sales without organizational efforts. Unlike in *Thompson* and *Winthrop* where no one undertook overt solicitation efforts, the Realty Company hired brokers who, using media and on site advertising, worked vigorously on

---

**29.** *See* section III. D. *infra.*

**30.** Henry Biedenharn testified that the greatest number of inquiries from lot shoppers occur

"whenever you start putting in improvements."

taxpayer's behalf. We do not believe that the employment of brokers should shield plaintiff from ordinary income treatment. *See Gamble v. Commissioner of Internal Revenue,* 5 Cir. 1957, 242 F.2d 586, 592; *Brown, supra* at 470; *Snell v. Commissioner of Internal Revenue,* 5 Cir. 1938, 97 F.2d 891, 892–93; *Cf. McFaddin v. Commissioner of Internal Revenue,* 5 Cir. 1945, 148 F.2d 570, 571. *See also* Levin, *supra* at 193–94. Their activities should at least in discounted form be attributed to Biedenharn. To the contrary, taxpayer argues that "one who is not already in the trade or business of selling real estate does not enter such business when he employs a broker who acts as an independent contractor. *Fahs v. Crawford,* 161 F.2d 315 (5 Cir. 1947); *Smith v. Dunn,* 224 F.2d 353 (5 Cir. 1955)." Without presently entangling ourselves in a dispute as to the differences between an agent and an independent contractor, *see generally* Levin, *supra,* we find the cases cited distinguishable from the instant circumstances. In both *Fahs* and *Smith,* the taxpayer turned the entire property over to brokers, who, having been granted total responsibility, made all decisions including the setting of sales prices.[31] In comparison, Biedenharn determined original[32] prices and general credit policy. Moreover, the Realty Company did not make all the sales in question through brokers as did taxpayers in *Fahs* and *Smith.*[33] Biedenharn sold the Bayou DeSiard and Biedenharn Estates lots and may well have sold some of the Oak Park land.[34] In other words, unlike *Fahs* and *Smith,* Biedenharn's brokers did not so completely take charge of the whole of the Hardtimes sales as to permit the Realty Company to wall itself off legally from their activities.

### E. Additional Taxpayer Contentions

Plaintiff presents a number of other contentions and supporting facts for our consideration. Although we set out these arguments and briefly discuss them, their impact, in the face of those factors examined above, must be minimal. Taxpayer emphasizes that its profits from real estate sales averaged only 11.1% in each of the years in controversy, compared to 52.4% in *Winthrop.* Whatever the percentage, plaintiff would be hard pressed to deny the substantiality of its Hardtimes sales in absolute terms (the subdivided lots alone brought in over one million dollars) or, most importantly, to assert that its real estate business was too insignificant to constitute a separate trade or business.[35]

The relatively modest income share represented by Biedenharn's real property dispositions stems not from a failure to engage in real estate sales activities but rather from the comparatively large profit attributable to the Company's 1965 ($649,231.34) and 1966 ($688,840.82) stock sales. The fact of Biedenharn's holding, managing, and selling stock is not inconsistent with the existence of a separate realty business. If in the face of taxpayer's numerous real estate dealings this Court held otherwise, we would be sanctioning special treatment for those individuals and companies arranging their business activities so that the income accruing to real estate sales represents only a small fraction of the taxpaying entity's total gains.

---

**31.** Taxpayer in *Fahs* received the lot's appraised value, all other price risk and presumably price control having been shifted to the broker.

**32.** One of the brokers testified that he "advance[d] prices as the market ascended."

**33.** Also, Henry Biedenharn stated that he kept a list of prospective buyers who had contacted him. When the Realty Company eventually hired a broker, Mr. Biedenharn provided the latter with these names.

**34.** *See* note 18 *supra.*

**35.** This Court has repeatedly recognized that a taxpayer may have more than one trade or business for purposes of Internal Revenue Code § 1221(1). *See, e. g., Ackerman v. United States,* 5 Cir. 1964, 335 F.2d 521, 524; *Gamble v. Commissioner of Internal Revenue,* 5 Cir. 1957, 242 F.2d 586, 591; *Fahs v. Crawford,* 5 Cir. 1947, 161 F.2d 315, 317.

Similarly, taxpayer observes that Biedenharn's manager devoted only 10% of his time to real estate dealings and then mostly to the company's rental properties. This fact does not negate the existence of sales activities. Taxpayer had a telephone listing, a shared business office, and a few part-time employees. Because, as discussed before, a strong seller's market existed,[36] Biedenharn's sales required less than the usual solicitation efforts and therefore less than the usual time. Moreover, plaintiff, unlike taxpayers in *Winthrop, supra* and *Thompson, supra,* hired brokers to handle many aspects of the Hardtimes transactions—thus further reducing the activity and time required of Biedenharn's employees.

Finally, taxpayer argues that it is entitled to capital gains since its enormous profits (74% to 97%) demonstrate a return based principally on capital appreciation and not on taxpayer's "merchandising" efforts. We decline the opportunity to allocate plaintiff's gain between long-term market appreciation and improvement related activities. *See generally* S. Surrey, W. Warren, P. McDaniel, H. Ault, *1 Federal Income Taxation* 1012 (1972). Even if we undertook such an analysis and found the former element predominant, we would on the authority of *Winthrop, supra* at 907–908, reject plaintiff's contention which, in effect, is merely taxpayer's version of the Government's unsuccessful argument in that case.[37]

## IV.

The District Court found that "[t]axpayer is merely liquidating over a long period of time a substantial investment in the most advantageous method possible." 356 F.Supp. at 1336. In this view, the original investment intent is crucial, for it preserves the capital gains character of the transaction even in the face of normal real estate sales activities.

The Government asserts that Biedenharn Realty Company did not merely "liquidate" an investment but instead entered the real estate business in an effort to dispose of what was formerly investment property. Claiming that Biedenharn's activities would result in ordinary income if the Hardtimes Plantation had been purchased with the intent to divide and resell the property, and finding no reason why a different prior intent should influence this outcome,[38] the Government concludes that original investment purpose is irrelevant. Instead, the Government would have us focus exclusively on taxpayer's intent and the level of sales activity during the period commencing with subdivision and improvement and lasting through final sales. Under this theory, every individual who improves and frequently sells substantial numbers of land parcels would receive ordinary income.[39]

While the facts of this case dictate our agreement with the Internal Revenue Service's ultimate conclusion of taxpayer

---

**36.** *See* section III. C. *supra.*

**37.** In *Galena Oaks Corp. v. Scofield,* 5 Cir. 1954, 218 F.2d 217, 220, the Court said: "Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time. When, however, such a taxpayer endeavors still further to increase his profits by engaging in a business separable from his investment, it is not unfair that his gain should be taxed as ordinary income."

**38.** The Government emphasizes the "unfairness" of two taxpayers engaging in equal sales efforts with respect to similar tracts of land but receiving different tax treatment because of divergent initial motives.

**39.** The Government suggests that taxpayer can avoid ordinary income treatment by selling the undivided, unimproved tract to a controlled corporation which would then develop the land. However, this approach would in many instances create attribution problems with the Government arguing that the controlled corporation's sales are actually those of the taxpayer. *See, e. g., Ackerman v. United States,* 5 Cir. 1964, 335 F.2d 521, 527–528. Furthermore, we are not prepared to tell taxpayers that in all cases a single bulk sale provides the only road to capital gains.

liability, they do not require our acquiescence in the Government's entreated total elimination of *Winthrop*'s first criterion, "the nature and purpose of the acquisition." Undoubtedly, in most subdivided-improvement situations, an investment purpose of antecedent origin will not survive into a present era of intense retail selling. The antiquated purpose, when overborne by later, but substantial and frequent selling activity, will not prevent ordinary income from being visited upon the taxpayer. *See, e. g., Ackerman v. United States*, 5 Cir. 1964, 335 F.2d 521; *Thompson v. Commissioner of Internal Revenue*, 5 Cir. 1963, 322 F.2d 122; *Galena Oaks Corp. v. Scofield*, 5 Cir. 1954, 218 F.2d 217; *Brown v. Commissioner of Internal Revenue*, 5 Cir. 1944, 143 F.2d 468. Generally, investment purpose has no built-in perpetuity nor a guarantee of capital gains forever more. Precedents, however, in certain circumstances have permitted landowners with earlier investment intent to sell subdivided property and remain subject to capital gains treatment. *See, e. g., Cole v. Usry*, 5 Cir. 1961, 294 F.2d 426; *Barrios Estate v. Commissioner of Internal Revenue*, 5 Cir. 1959, 265 F.2d 517; *Smith v. Dunn*, 5 Cir. 1955, 224 F.2d 353.

The Government, attacking these precedents, argues that the line of cases decided principally in the 1950's represented by *Barrios Estate, supra; Goldberg v. Commissioner of Internal Revenue*, 5 Cir. 1955, 223 F.2d 709; *Ross v. Commissioner of Internal Revenue*, 5 Cir. 1955, 227 F.2d 265 and including *United States v. Temple*, 5 Cir. 1966, 355 F.2d 67, are inconsistent with our earlier holdings in *Galena Oaks Corp., supra; White v. Commissioner of Internal Revenue*, 5 Cir. 1949, 172 F.2d 629; *Brown, supra*, and the trend of our most recent decisions in *Ackerman, supra, Thompson, supra* and including Judge Wisdom's dissent in *Temple, supra*. Because of the

ad-hoc nature of these previous decisions and the difficulty of determining in each instance the exact combination of factors which placed a case on one side or the other of the capital gains-ordinary income boundary, we are loath to overrule any of these past decisions. In a sense, we adhere to our own admonitions against efforts at reconciling and making consistent all that has gone before in the subdivided realty area. But in so avoiding a troublesome and probably unrewarding task, we are not foreclosed from the more important responsibility of giving future direction with respect to the much controverted role of prior investment intent, nor are we precluded from analyzing that factor's impact in the context of the present controversy.

We reject the Government's sweeping contention that prior investment intent is always irrelevant. There will be instances where an initial investment purpose endures in controlling fashion notwithstanding continuing sales activity. We doubt that this aperture, where an active subdivider and improver receives capital gains, is very wide; yet we believe it exists. We would most generally find such an opening where the change from investment holding to sales activity results from unanticipated, externally induced factors which make impossible the continued pre-existing use of the realty. *Barrios Estate, supra*, is such a case. There the taxpayer farmed the land until drainage problems created by the newly completed intercoastal canal rendered the property agriculturally unfit. The Court found that taxpayer was "dispossessed of the farming operation through no act of her own." *Supra* at 518. Similarly, Acts of God, condemnation of part of one's property, new and unfavorable zoning regulations, or other events forcing alteration of taxpayer's plans create situations making possible subdivision and improvement as a part of a capital gains disposition.[40]

**40.** A Boston University Law Review article canvassing factors inducing involuntary changes of purpose in subdivided realty cases enumerates among others the following: a pressing need for funds in general, illness or

old age or both, the necessity for liquidating a partnership on the death of a partner, the threat of condemnation, and municipal zoning restrictions. Levin, *Capital Gains or Income Tax on Real Estate Sales*, 37 B.U.L.Rev.1965,

However, cases of the ilk of *Ackerman, supra, Thompson, supra,* and *Winthrop, supra,* remain unaffected in their ordinary income conclusion. There, the transformations in purpose were not coerced. Rather, the changes ensued from taxpayers' purely *voluntary* responses to increased economic opportunity—albeit at times externally created [41] —in order to enhance their gain through the subdivision, improvement, and sale of lots. Thus reinforced by the trend of these recent decisions, we gravitate toward the Government's view in instances of willful taxpayer change of purpose and grant the taxpayer little, if any, benefit from *Winthrop's* first criterion in such cases.

The distinction drawn above reflects our belief that Congress did not intend to automatically disqualify from capital gains bona fide investors forced to abandon prior purposes for reasons beyond their control. At times, the Code may be severe, and this Court may construe it strictly, but neither Code nor Court is so tyrannical as to mandate the absolute rule urged by the Government. However, we caution that although permitting a land owner substantial sales flexibility where there is a forced change from original investment purpose, we do not absolutely shield the constrained taxpayer from ordinary income. That taxpayer is not granted *carte blanche* to undertake intensely all aspects of a full blown real estate business. Instead, in cases of forced change of purpose, we will continue to utilize the *Winthrop* analysis discussed earlier but will place unusually strong taxpayer-favored emphasis on *Winthrop's* first factor.

Clearly, under the facts in this case, the distinction just elaborated under-

mines Biedenharn's reliance on original investment purpose. Taxpayer's change of purpose was entirely voluntary and therefore does not fall within the protected area. Moreover, taxpayer's original investment intent, *even if* considered a factor sharply supporting capital gains treatment, is so overwhelmed by the other *Winthrop* factors discussed *supra,* that that element can have no decisive effect. However wide the capital gains passageway through which a subdivider with former investment intent could squeeze, the Biedenharn Realty Company will never fit.

## V.

The District Court, citing *Malat v. Riddell,* 1966, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102, stated that "the lots were not held . . . primarily for sale as that phrase was interpreted . . . in *Malat* . . . ." 356 F.Supp. at 1335.[42] Finding that Biedenharn's primary purpose became holding for sale and consequently that *Malat* in no way alters our analysis here, we disagree with the District Court's conclusion. *Malat* was a brief per curiam in which the Supreme Court decided only that as used in Internal Revenue Code § 1221(1) the word "primarily" means "principally," "of first importance." The Supreme Court, remanding the case, did not analyze the facts or resolve the controversy which involved a real estate dealer who had purchased land and held it at the time of sale with the dual intention of developing it as rental property or selling it, depending on whichever proved to be the more profitable. *Malat v. Riddell,* 9 Cir. 1965, 347 F.2d 23, 26. In contrast, having substantially abandoned its in-

194–95 (1957). Although we might not accept all of these events as sufficient to cause an outcome favorable to taxpayer, they are suggestive of the sort of change of purpose provoking events delineated above as worthy of special consideration.

**41.** For example, in *Thompson, supra,* taxpayer's motivation undoubtedly was the increase in value created by the wartime boom in Bor-

ger, Texas. *Biedenharn* itself would fall within this category.

**42.** For discussions of *Malat* see generally Bernstein, *"Primarily for Sale"; A Semantic Snare,* 20 Stan.L.Rev. 1093 (1968); Note, *"Primarily for Sale" in I.R.C. Sections 1221 and 1231 Held to Mean "Principally for Sale" Rather than "Substantially for Sale"—Malat v. Riddell,* 64 Mich.L.Rev. 1611 (1966).

vestment and farming[43] intent, Biedenharn was cloaked primarily in the garb of sales purpose when it disposed of the 38 lots here in controversy. With this change, the Realty Company lost the opportunity of coming within any dual purpose analysis.[44]

■ We do not hereby condemn to ordinary income a taxpayer merely because, as is usually true, his principal intent at the exact moment of disposition is sales. Rather, we refuse capital gains treatment in those instances where over time there has been such a thoroughgoing change of purpose, *see, e. g., Thompson, supra,* as to make untenable a claim either of twin intent or continued primacy of investment purpose.[45]

## VI.

Having surveyed the Hardtimes terrain, we find no escape from ordinary income. The frequency and substantiality of sales over an extended time, the significant improvement of the basic subdivisions, the acquisition of additional properties, the use of brokers, and other

less important factors persuasively combine to doom taxpayer's cause. Applying *Winthrop*'s criteria, this case clearly falls within the ordinary income category delineated in that decision.[46] In so concluding, we note that *Winthrop* does not represent the most extreme application of the overriding principle that "the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Corn Products Refining Co. v. Commissioner of Internal Revenue,* 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29, 35. *See also Commissioner of Internal Revenue v. Lake,* 1958, 356 U.S. 260, 265, 78 S.Ct. 691, 694, 2 L.Ed.2d 743, 748. *Accord, Winthrop, supra* at 911.

We cannot write black letter law for all realty subdividers and for all times, but we do caution in words of red that once an investment does not mean always an investment. A simon-pure investor forty years ago could by his subsequent activities become a seller in the ordinary course four decades later. The period of Biedenharn's passivity is in the distant past; and the taxpayer has since

---

**43.** The District Court found that Biedenharn "is still farming a large part of the land . . . ." 356 F.Supp. at 1336. The record suggests neither that Biedernharn as opposed to a lessee currently farms on the Hardtimes Plantation nor that the magnitude of that lessee's farming operations is substantial. More importantly, the District Court did not find and the plaintiff does not assert that Biedenharn simultaneously held the subdivided land for sale and for farming either before or at the time of disposition. Taxpayer claims no dual purpose.

**44.** *See Bynum v. Commissioner of Internal Revenue,* 46 T.C. 295, 299 (1966); *Cf. Continental Can Co. v. United States,* 422 F.2d 405, 414, 190 Ct.Cl. 811 (1970), *cert. denied,* 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed.2d 46.

**45.** *Winthrop, supra,* although different from *Biedenharn* in respect to initial intent, is not contrary to our *Malat* analysis. In *Winthrop,* taxpayer inherited property, a method of acquisition which is necessarily neutral as to original purpose. We found that after receipt of his legacy, the *Winthrop* taxpayer at all times held the lots "primarily for sale." *Winthrop, supra* at 911. Although encountering

original investment purpose instead of neutral intent in the present case, we conclude that Biedenharn dissipated that initial purpose by its later sales activities. This alteration resulted in Biedenharn, like Winthrop, holding retail lots over an extended period "primarily for sale to customers in the ordinary course of [his] trade or business." Thus, in both cases, taxpayers moved to and maintained a primary sales purpose over an extended period. In neither instance did they hold for dual purposes.

**46.** The greater percentage of realty sales income, the construction of five houses, the holding of a real estate license, the originally neutral acquisition purpose, and the slightly higher pitch of sales in the years immediately preceding suit all characteristic of *Winthrop* do not make that case significantly different from *Biedenharn* any more than the longer history of sales, additional acquisition of land, use of a business office, existence of a telephone listing, original investment purpose, or employment of brokers who advertised and actively solicited customers characteristic of *Biedenharn* materially distinguish the present suit from *Winthrop.* The cases are at bottom similar. One need not go beyond *Winthrop* in order to decide the present dispute.

undertaken the role of real estate protagonist. The Hardtimes Plantation in its day may have been one thing, but as the plantation was developed and sold, Hardtimes became by the very fact of change and activity a different holding than it had been at its inception. No longer could resort to initial purpose preserve taxpayer's once upon a time opportunity for favored treatment. The opinion of the District Court is reversed.

## APPENDIX I
### (Plaintiff's Answers to Interrogatory 26)

| YEAR | GROSS SALES | NUMBER LOTS |
|---|---|---|
| 1923 | 1,900.00 | 4 |
| 1924 | 1,050.00 | 2 |
| 1925 | 7,442.38 | 18 |
| 1926 | 11,184.00 | 29 |
| 1927 | 9,619.25 | 52 |
| 1928 | 49,390.55 | 37 |
| 1929 | 35,810.25 | 55 |
| 1930 | 8,473.00 | 24 |
| 1931 | 5,930.00 | 18 |
| 1932 | none | none |
| 1933 | 520.00 | 2 |
| 1934 | 5,970.00 | 8 |
| 1935 | 2,639.00 | 7 |
| 1936 | 2,264.00 | 3 |
| 1937 | 14,071.00 | 8 |
| 1938 | 1,009.00 | 3 |
| 1939 | 5,558.00 | 10 |
| 1940 | 3,252.00 | 4 |
| 1941 | 2,490.00 | 3 |
| 1942 | 6,714.00 | 9 |
| 1943 | 6,250.00 | 12 |
| 1944 | 9,250.00 | 38 |
| 1945 | 15,495.00 | 20 |
| 1946 | 12,732.58 | 29 |
| 1947 | 38,310.00 | 169 |
| 1948 | 23,850.00 | 22 |
| 1949 | 8,830.00 | 26 |
| 1950 | 9,370.00 | 19 |
| 1951 | 55,222.99 | 16 |
| 1952 | 38,134.29 | 16 |
| 1953 | 123,007.22 | 17 |
| 1954 | 235,396.04 | 10 |
| 1955 | 76,805.00 | 20 |
| 1956 | 100,593.25 | 61 |
| 1957 | 133,448.10 | 36 |
| 1958 | 110,369.00 | 27 |
| 1959 | 44,400.00 | 12 |
| 1960 | 130,610.19 | 21 |
| 1961 | 48,729.60 | 25 |
| 1962 | 6,720.00 | 1 |
| 1963 | 7,475.00 | 1 |
| 1964 | 77,650.00 | 10 |
| 1965 | 75,759.00 | 10 |
| 1966 | 155,950.00 | 20 |
| 1967 | 75,380.00 | 9 |
| 1968 | 89,447.50 | 10 |
| 1969 | 31,010.00 | 3 |
| 1970 | none | none |
| 1971 | 130,000.00 | 139 |

RONEY, Circuit Judge (specially concurring):

I concur with the result and the analysis in Judge Goldberg's opinion with this comment: as I understand the holding in *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969), and Judge Goldberg's opinion here, the Court does not deviate from strict application of the statute to determine whether property is excluded from capital asset—capital gains treatment because it is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A. § 1221(1). As I understand the various factors set forth in *Withrop* and discussed in Judge Goldberg's opinion here, the statutory test is still paramount and the factors serve only to aid in the determination of whether the statutory characteristics of non-capital assets are present. Under § 1221(1) it must first be determined that the property is held "primarily for sale;" and if so, that the sales are made in the ordinary course of taxpayer's trade or business. This statutory standard is strictly followed in both *Winthrop* and in this case. The various indicia which courts have delineated are useful in applying the § 1221(1) test to the facts of a case, but should not be regarded as a substitute for the statutory test.

GEE, Circuit Judge, with whom BELL, COLEMAN, AINSWORTH and DYER, Circuit Judges, join, dissenting.

Viewing as incorrect the en banc majority's restatement of facts and law, I must respectfully dissent. I would ad-

here to the panel opinion, reported at 509 F.2d 171, which attempted to apply existing, controlling precedent in our circuit to the facts of this very close case as they were found by the district court. To obtain a different result, the majority has found it necessary to revise the law and refind the facts in important respects, as though the obtaining of capital gains treatment by this taxpayer in the three years in question were a catastrophe to be avoided at all costs.[1]

First, in setting out the facts of this case, the majority summarily discounts a critical trial court factfinding without ruling it clearly erroneous.[2] The majority rejects the district court's finding that taxpayer "is still farming a large part of the land," 356 F.Supp. at 1336,[3] refinding the facts as being that taxpayer's tenant farmer "may" presently be farming the land, supra at 411, and that neither plaintiff nor the lower court claimed any dual purpose, id. at 423 n. 43. But the record affirmatively shows that the land has been and continues to be farmed,[4] and the lower court specifically found multi-purpose use of the land.[5]

Second, although insisting at one point that it only "resummarizes" the relevant case law, id. at 415 n. 23, the majority revises the old test by placing pre-eminent emphasis on sales activity and improvements, effectively eliminating the other factors enunciated in *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969).[6] It is true that, to justify its emphasis on sales, the majority claims to detect in our earlier cases an overriding tendency toward finding ordinary income as the frequency and substantiality of sales increase. But that the strength of one factor, if it *is* a factor, can affect the outcome is self-evident, and as the panel opinion recognized in discussing a different one: "[I]f this factor is to be included in the seven other than as a sham there must be instances imaginable in which it will be critical, perhaps dispositive." 509 F.2d at 175. To bolster its reasoning, the majority points to *Thompson v. Commissioner of Internal Revenue*, 322 F.2d 122 (5th Cir. 1963), which held against the taxpayer, and asserts that the other sales indicia favored the taxpayer more in that case than here. Not so: in *Thompson* the taxpay-

1. The majority opinion correctly notes, *supra* at 413, n. 17, that the panel opinion errs insofar as it suggests that all sales were by commission brokers during the tax years in issue. A very substantial majority were, however; and this circumstance, though not devoid of significance, is not central to the reasoning of either the panel opinion or the majority opinion here, use of brokers being consistent with either a liquidation or a business.

2. While I agree with my brethren, *supra* at 416 n. 25, that this court must review ultimate legal determinations de novo, we must remember that fact determinations, which admittedly affect our legal conclusions, should be overturned only after careful scrutiny under the strict "clearly erroneous" standard.

3. See also id. *at 1335 ("substantial parts of [taxpayer's property] are still farmed").*

4. *See* Transcript at 8, 50; Deposition of B. W. Biedenharn at 37–38. In fact, many potential customers were rejected when they requested land that taxpayer intended to farm. *Id.* at 22.

5. The district court found the following:

 Sales of lots were not the sole object of taxpayer's business, nor did they approxi-

mate even a substantial part of taxpayer's activities. *There was no singleness of purpose here* . . . . Here the property has been used for other purposes and still is being used for such.

 356 F.Supp. at 1336 (emphasis added).

6. Indeed, at another point the majority appears to say that *Winthrop* will no longer be followed at all, except in cases of "forced change of purpose." *Supra* at 422. If so, we are not told what the new test is to be, unless it is—as the opinion comes perilously close to saying—that unless there is *forced* change of purpose there can be no capital gain. But the quoted language may mean no more than that the majority proposes to emphasize one *Winthrop* factor in one sort of case and not in another. If so, one can only pity the poor taxpayer, confronted now not only by *Winthrop* but by the court's announcement that dispositive nuances of weight attach to *some* factors in *some* cases. If this were the law before today, there had been few hints of it; and with this announcement we all but lay down as law that ordinary income is whatever we say it is.

er earned 48.8% of his income from the real estate sales in question, as compared to 11.1% here. More significantly, once Thompson's sales began, "there is no evidence that he thereafter held the lots for any purpose *other than* the sale to prospective purchasers." *Id.* at 128 (emphasis in original). Here, however, taxpayer still farms the land.

To explain its emphasis on improvements, the majority stresses the similarity between taxpayer's improvements and those present in *Winthrop*. *Supra* at 417. But this comparison, too, is mistaken. The *Winthrop* court emphasized that property does not cease to be a capital asset merely because its increase in value was due in part to the taxpayer's efforts in making improvements, 417 F.2d at 907–09, quoting the same portion of *Barrios' Estate v. Commissioner of Internal Revenue*, 265 F.2d 517 (5th Cir. 1959), that the panel in this case cited:

> The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water. It is hardly conceivable that taxpayer could have sold a lot without doing these things.

*Id.* at 520, quoted with approval in *Winthrop*, 417 F.2d at 909, and *Biedenharn*, 509 F.2d at 174 (panel opinion). Furthermore, the *Winthrop* situation was shot through with facts not here present supporting the conclusion that the land was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business": (1) taxpayer used the land for nothing but subdividing and selling, and "[t]here were, therefore, no multiple, dual, or

changes of purpose during the relevant years . . . . The taxpayer, long before the tax years in question, had as his *sole motivation* the sale of [the property]," 417 F.2d at 911 (emphasis added)—i.e., the property was held "primarily for sale"; (2) as in *Thompson*, the taxpayer's primary activity was substantial and continuous real estate sales, from which she earned 52.4% of her income—i.e., this activity was a "business"[7]; and (3) the taxpayer began selling shortly after he acquired the land, never using it for any other purpose[8]—i.e., the sales were "ordinary in the course of this business."

Thus, to the extent that I agree with the majority that "[o]ne need not go beyond *Winthrop* in order to decide the present dispute," *supra* at 423 n. 46, I think *Winthrop*, in the form in which it stood at the time this taxpayer was presumably arranging its affairs in reliance on that opinion requires a different result in this case—that reached by the panel, 509 F.2d 171 (1975).

In the course of "resummarizing" the relevant test, the majority adds a wholly new element, volition or the lack of it, in cases such as this involving an initial investment purpose followed by substantial and continuous sales activity. But to permit a finding of continuing investment purpose in the face of major sales activity only (or as the majority says, *supra* at 421, "most generally") when that activity "results from unanticipated, externally induced factors which make impossible the continued pre-existing use of the realty," *id.* at 421, makes impossible any voluntary disposition of investment property at capital gains rates, exalts one factor—sales activity—over all others, and changes the law as de-

---

7. The majority attempts to discount the significance of the low portion of taxpayer's income represented by real estate sales (11.1%) by pointing out that the profit figure is high in absolute terms and low as a percentage only because taxpayer earns high profits in other businesses. *Supra* at 419. I fail to discern the significance of either explanation, especially in light of the importance placed on a high relative percentage in both *Thompson* and *Winthrop*, unless the opinion means to say

that taxpayers with high incomes are less likely to have capital gains than those with low incomes.

8. As the *Winthrop* court recognized, 417 F.2d at 912, this singleness of purpose, rather than any such "forced change of purpose" as is introduced by the majority here, *supra* at 418, distinguishes *Winthrop* from *Barrios' Estate*.

clared in *Thompson* and *Winthrop*, if not their results. This circuit's long-standing inclusion of factors other than sales activity in the capital gains/ordinary income calculus implicitly recognized that an investor could engage in a voluntary liquidation and begin selling property without a change of purpose. Holding that property is not part of a business only so long as it is sold in large blocs, but not if it is sold in small parcels, discriminates irrationally against an investor who decides on liquidation but cannot locate purchasers interested in large acquisitions.[9]

And so, under the guise of emphasizing certain factors, the majority appears to have completely changed the *Winthrop* test to eliminate all factors but one. And while I entirely agree with the majority's redundant warning that "once an investment does not mean always an investment," *id.* at 423, I would also suggest that once a sale does not mean always a business.

9. As the majority admits, *supra* at 412 n. 10, the record does not clearly indicate the number of *sales*, as opposed to the number of lots sold, and in some years we know that single sales accounted for the large numbers of lots disposed of in those years, see *id.* at 412 nn. 11 & 12.