VIRGIL E. VANBIBBER and SYBLE A. VANBIBBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Bibber v. Commissioner
Docket No. 1433-82.
United States Tax Court
T.C. Memo 1985-344; 1985 Tax Ct. Memo LEXIS 290; 50 T.C.M. (CCH) 401; T.C.M. (RIA) 85344; July 15, 1985. Bernard J. Boyle,Donald W. Buttrey, and John W. Boyd, for the petitioners. Clarence E. Barnes and Rodney J. Bartlett, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Taxable Year
Amount of Deficiency
1977
$56,569.38
1978
$72,223.90
1979
$55,905.04
The issues for decision are: (1) whether the sales of subdivided real estate lots held by petitioners' *292 solely owned corporation, VanBibber Lake, Inc. (which for the years in issue was an electing small business corporation within the meaning of section 1371 [1]), were sales of property held primarily for sale to customers in the ordinary course of the Corporation's business during its taxable years ended October 31, 1977 through October 31, 1979; (2) whether respondent erred in determining that VanBibber Lake, Inc.'s computation of its basis in the lots sold during the years in issue did not reflect actual costs of land and improvements with respect to each lot, but rather reflected arbitrary amounts established for each lot; (3) whether respondent erred in disallowing the depreciation deductions claimed by VanBibber Lake, Inc. during the years at issue with respect to the costs of improvements; and (4) in the event of a decision in favor of petitioners on the first issue, whether respondent erred in determining that the petitioners are not entitled to the deductions claimed for ordinary losses sustained by the Corporation under sections 1374 and 1375? FINDINGS OF FACT *293 Some of the facts of this case have been stipulated and are so found. The parties' stipulation, together with the exhibits thereto, are incorporated herein by this reference. Petitioners, Virgil E. VanBibber and Syble A. VanBibber, husband and wife, resided in Greencastle, Indiana as of the time of the filing of the petition herein. Petitioners timely filed joint Federal income tax returns for taxable years 1977 through 1979. Virgil, who has a fifth grade education and at the time of trial was approximately fifty-nine years of age, had several jobs after his discharge from military service in 1942 until 1954. In 1954, Virgil bought a back-hoe and engaged in the excavation business on a self-employed basis. On August 8, 1962, petitioners acquired 115 acres of rural unimproved real estate in the northern half of Putnam County, Indiana, for a total purchase price of $18,500. The real estate was acquired for the purpose of developing a rental mobile home park for retirees. By July, 1963, petitioners began construction of what was to become VanBibber Lake. Having obtained a permit to build the lake, Virgil proceeded personally to clear a ravine and build a dam with VanBibber *294 Lake filling. In 1963, petitioners also obtained a permit from the State Board of Health to install mobile home pads. Fifty-five mobile home pads were installed in 1963. By spring of 1964, petitioners had created a functional rental mobile home park [2] by building roads, installing water, electrical and sewer connections to the mobile home sites, and constructing a general store and coinoperated laundry facility. Petitioners began renting sites in 1964. In 1965, petitioners began selling mobile homes and travel trailers at the VanBibber Lake property on a retail basis. This business continued throughout the years at issue. Also in 1965, petitioners decided to expand their targeted market from retirees to include families. As a result of this decision, petitioners built a beach and a beachhouse on the shore of VanBibber Lake as a way of making the property more attractive to families. In 1966, approximately thirty-five additional mobile home pads were installed. In 1967, seventy-five additional acres of land, which were adjacent to the original 115 acre tract, were acquired *295 for a total purchase price of $12,500. Between 1967 and 1969, portions of the second tract and the undeveloped portions of the original tract were improved by the construction of roads and mobile home pads and the installation of water, sewer and electrical connections. At the conclusion of this phase of the development, petitioners had developed approximately 440 rental mobile home sites and had staked out approximately 220 rental camping sites. Approximately eighty percent of the sites were rented out in 1969, while the remaining sites were offered for rent. Throughout all phases of development, Virgil's participation was not limited to "behind-the-desk" management. Along with his sons and employees, Virgil laid the sewer pipe lines and poured concrete for the mobile home pads and the sidewalks. Virgil personally operated an old dump truck in hauling crushed stone for the roads. He also helped run electrical wires on overhead poles throughout the development, and operated a backhoe in digging trenches for installing the electrical wiring to the meter bases at the mobile home pads. In addition, Virgil sweated each and every one of the joints [3] of the copper waterlines that *296 serviced the development. In January of 1970, petitioners formed VanBibber Lake, Inc. ("the Corporation"), an Indiana corporation. In exchange for all of the Corporation's stock, petitioners transferred to the Corporation all of the assets of their rental mobile home park business, as well as all of the assets of the retail mobile home and travel trailer sales business. As set forth in its Articles of Incorporation, the Corporation was formed "to engage in the general lake and recreation development business." The Corporation was specifically authorized, inter alia, to "deal in personal property" and "to deal in real property" including the acquisition, holding, owning, improving, managing, leasing, selling, conveying or mortgaging of "real estate of every kind." Following incorporation, the Corporation timely filed an election to be treated as a small business corporation under section 1371. From January, 1970 through at least November 1, 1979, the Corporation continued to be an electing small business corporation under section 1371. The Corporation *297 filed its first United States Small Business Corporate Income Tax Return for VanBibber Lake, Inc. for the short period January 16, 1970 through October 31, 1970. Thereafter, the Corporation filed its Federal income tax returns based on a fiscal year ending October 31. For all relevant periods, petitioners were the sole shareholders of the Corporation, and Virgil served as its President. As President of the Corporation, Virgil acted as its chief executive and operating officer. Following its incorporation in 1970, the Corporation platted and subdivided section 1 of the VanBibber Lake property and caused a property owners' association to be formed. The subdivision of section 1 was motivated by the fact that several then tenants threatened to move unless they could buy their lots. Following subdivision of section 1, the lots were available for sale. Five lots were sold in 1971, followed by sales of two lots in 1972 and two lots in 1973. [4] All of these sales were to the tenants occupying the lots. At no time prior to 1974 did the Corporation advertise any lots for sale. *298 The Corporation continued to improve the VanBibber Lake property. In 1971, the Corporation built a water tower of approximately one hundred feet in height. During 1973, the Corporation constructed a water treatment plant. In 1971, Virgil began experiencing certain health problems. After consultations with the family physician and cardiologist, his problems were diagnosed as angina. Virgil was given nitroglycerine and the advice that he would have to either restrict his business activities or face a shorter life expectancy. After receiving his physicians' recommendations, Virgil listed the Corporation's property for sale with George Van Landingham, a real estate agent who had advised Virgil that he specialized in mobile home park sales. After the listing of the Corporation's property, Van Landingham advertised the availability of the property in various publications, including the Indianapolis Star. During the period in which the Corporation's property was listed with Van Landingham, representatives of Goldman & Company, a Chicago area-based investment company and mobile home park operator, contacted Virgil through Van Landingham. Virgil met with representatives of Goldman *299 & Company, but did not receive an offer for the property. The Goldman representatives had concluded, among other things, that the number of businesses involved in the operation of the park at VanBibber Lake posed management problems. Petitioners' sons had been involved in the mobile home park business intermittently since its inception. By 1973, however Virgil had abandoned any hopes that his sons would take over the existing business operations. On August 25, 1973, a special meeting of the Board of Directors of the Corporation was held to discuss the business generally and "the need for VanBibber Lake, Inc. to start disposing of company assets". The fact that, in July, 1973, bank financing of mobile homes, through the FHA program or otherwise, had become unavailable was discussed. It was unanimously agreed that Alan Stanley, the county surveyor, would be engaged to plat and subdivide the remaining sections of the mobile home park for the purpose of selling lots, the determination having been made that sales would yield a greater return than what the rental operations were then producing. The subdivision project thus agreed upon began in 1974. The Corporation began to sell *300 lots actively in that year. Its sales promotional activities took the form of mail solicitation of long-time tenants, advertising at sports, hobby and recreation shows in Indianapolis, and advertising in Indianapolis, Crawfordsville and Greencastle, Indiana newspapers. In fiscal year ended October 31, 1974, the Corporation sold 104 lots for a total of $386,667. The Corporation's sales of mobile homes, by contrast, plunged from $854,509 for fiscal year 1973 to $167,158 for fiscal year 1974. The decline in mobile home retail sales was due to the termination, in the early part of 1974, of the FHA programs under which insured financing for mobile home purchasers had been available. All of the sales activities with respect to the lots at VanBibber Lake were conducted by Virgil, a member of his family, or an employee of the Corporation. No broker was ever used. Virgil alone had the authority to set the sales price. All sales were conducted from the business office located on the property. In March, 1974, the Little Walnut Creek Conservation District purchased 96.68 acres of unimproved land from the Corporation. Soon thereafter, a dam was constructed which resulted in the creation *301 of Little Walnut Creek Reservoir. The reservoir was owned and operated by a government conservancy district and was adjacent to the real estate owned and operated by VanBibber Lake, Inc. In late 1974, the Corporation was notified by the Office of Interstate Land Sales Registration ("OILSR") of the Department of Housing and Urban Development that the Corporation's sales program might be covered by the Interstate Land Sales Full Disclosure Act. After numerous communications between OILSR and the Corporation, OILSR notified the Corporation in 1975 that the sales program was covered by the Interstate Land Sales Full Disclosure Act. As a result, the Corporation either had to file a registration statement or cease selling bare lots. The decision was made that the Corporation would not file the registration statement, but would only sell lots with dwellings thereon. In addition, the Corporation had to mail rescission offer letters to each person who had purchased a lot, except for those purchasers who bought their lot and a structure at the same time, and those who had a modular or mobile home, without wheels and tongue, located on the lot. The decision to comply with the Interstate *302 Land Sales Full Disclosure Act by limiting sales to sales of lots with dwellings required the Corporation to look to a broader potential customer base than its current tenants. In 1976 or 1977, the Corporation listed the mobile home park business (including the mobile home sales operation) with Goldman & Associates, a manufactured housing real estate brokerage company affiliated with Goldman & Company. At the time, Goldman & Associates was the only broker in Indiana that dealt exclusively in mobile home parks. The Corporation periodically has renewed the listing agreement with Goldman & Associates. The August 21, 1981 agreement, that was introduced into evidence at trial, provides, with respect to the subdivided lots, as follows: "VanBibber Lake, Inc., agrees to sell approximately 400 lots consisting of camping lots, mobile home lots and modular homes lots. * * * [A]ny lots sold by VanBibber Lake, Inc., prior to the sale of the total listed lots will be deducted at the listed wholesale price of lots." (Emphasis supplied.) The various sources of income realized by the Corporation, for taxable years ended October 31, 1970 through 1979, are set out in the following table: *303 TAXABLE YRS.
ENDED
(1)
+
(2)
+
(3)
+
(4)
October 31, 1970
$654,775
$54,874
$0   $0  October 31, 1971
626,653
63,335
1,092
0  October 31, 1972
705,458
54,844
1,483
0  October 31, 1973
854,509
63,086
1,808
6,518
October 31, 1974
167,158
62,862
6,409
0  October 31, 1975
484,940
39,396
51,719
13,000
October 31, 1976
490,488
39,876
36,349
56,319
October 31, 1977
723,917
49,626
19,115
0  October 31, 1978
902,092
46,750
19,359
105,950
October 31, 1979
697,915
50,499
10,671
0  TOTALS
$6,307,905
$525,148
$148,005
$181,787
Without Sale of
Assets & income
on casualty losses
Deferred sale of
lots; that portion
of installment sales
not yet collected
TAXABLE YRS.
ENDED
-
(5)
(6)
(7)
(8)
+
(9)
October 31, 1970
$709,649 0 $0   $ 0    $0  October 31, 1971
691,080 5 27,300
0    4,489
October 31, 1972
761,785 2 11,000
11,000
4,733
October 31, 1973
925,921 2 12,000
12,000
5,985
October 31, 1974
236,429 104
386,667
97,410
54,701
October o1, 1975
589,055 69
257,420
83,166
99,756
October 31, 1976
623,032 37
142,000
142,003
97,271
October 31, 1977
792,658 60
297,021
174,600
51,314
October 31, 1978
1,074,151 21
119,100
119,100
56,817
October 31, 1979
759,035 40
220,989
193,489
122,579
TOTALS
$7,162,795 340
$1,473,497
$832,768
$497,645
Without Sale of
assets & income
on casualty losses
(175,269)
Deferred sale of
lots; that portion
of installment sales
not yet collected
$6,987,526 *304 TAXABLE YRS.
ENDED
-
(10)
(11)
(12)
(13)
October 31, 1970
$0  $709,649 00.00%
100.00%
October 31, 1971
4,489
695,569 .64%
99.36%
October 31, 1972
15,733
777,518 02.03%
97.97%
October 31, 1973
17,985
943,906 01.91%
98.09%
October 31, 1974
152,111
388,540 39.15%
60.85%
October 31, 1975
182,922
771,977 23.70%
76.30%
October 31, 1976
239,274
862,306 27,75%
72.25%
October 31, 1977
225,914
1,018,572 22.18%
77.82%
October 31, 1978
175,917
1,250,068 14.07%
85.93%
October 31, 1979
316,068
1,075,103 29.40%
70.60%
TOTALS
$1,330,413
$8,493.208 15,67%
84.33%
Without Sale of
assets & income
on casualty losses
(175,269)
Deferred sale of
lots; that portion
of installment sales
not yet collected
150,079
150,079 $1,480,492
$8,468,018 (1) Annual mobile home & trailer sales (2) Income from trailer park rentals & operation of the grocery and laundromat (3) Internal income from installment sales of mobile homes (4) Other miscellaneous income (5) Total gross income from sources other than the sale of lots (6) The number of lots sold *305 annually during each of the ten fiscal years (7) Total lot sales (8) Cash sales (9) Princip[al] and interest collected on installment sales (10) Total receipts from lot sales (11) Gross total sales and receipts from operations [(5) + (10)] (12) The respective percentage of the gross receipts rjepresented by sales of lots only [(10) + (11)] (13) The respective percentage of the gross receipts represented by sources other than lot sales [(5) + (11)] Throughout the years in issue (1977 through 1979), the Corporation continued to improve the subdivided lots, including improving the water system for the entire subdivision. After a fire in 1978 destroyed the general store and laundromat, the store, but not the laundromat, was rebuilt and leased to a third party. Neither the Corporation nor petitioners subdivided any other property. Virgil did, however, acquire an interest in an eighty-acre tract of farmland in either 1978 or 1979 for the purpose of speculation of possible development. The entire tract was sold two years later in its unimproved state. Although it is not clear from the record whether the Corporation or Virgil in his individual capacity entered *306 into the transactions, either the Corporation or Virgil, during the years in issue, and on several occasions, bought land, improved and installed a modular home on it, and sold the lot and home on contract. At no time did Virgil ever hold a real estate license. On occasion, however, the Corporation was also involved in the reselling of lots at VanBibber Lake. On these occasions, either the Corporation was then the contract vendor with respect to a lot that had been sold in an installment sale on which the contract vendee was still making payments, or the lot owner would give the Corporation an option to purchase the lot and the Corporation would then undertake the sale of the lot. During the taxable years ended October 31, 1977 through 1979, the Corporation sold 60, 21, and 40 lots, respectively, which sales resulted in total gross sales receipts of $297,021, $119,100 and $220,989, respectively. The lot sales were the one profitable activity conducted by the Corporation during these years. The Corporation reported losses from its other activities, for taxable years ended October 31, 1977 through 1979, in the amounts of $88,031.99, $13,472.38 and $195,370.44, respectively. *307 As of October 1, 1979, a total of 720 lots of the VanBibber Lake development had been platted. Of this total, 440 lots had been improved. A total of 340 of the total improved lots had been sold between 1971 and October 31, 1979. The remaining 100 lots were either rented or held for sale or rent. The total accumulated improvements to the VanBibber Lake development, as of the following dates, were: Date
Total cumulative improvements
October 31, 1973
$132,343.28
October 31, 1974
$228,327.37
October 31, 1975
$270,099.95
October 31, 1976
$348,254.81
October 31, 1979
$374,355.10
On its United States Small Business Corporation Income Tax Returns (Forms 1120S) for taxable years ended October 31, 1977 through 1979, the Corporation reported profits from lot sales as capital gains. On their joint individual income tax returns for the taxable years 1977 and 1978, petitioners reported their distributable taxable income from the Corporation in two segments. They reported long term capital gains attributable to the lot sales separately from the ordinary losses resulting from the Corporation's other business activities. ULTIMATE FINDING OF FACT The Corporation *308 held the subdivided lots at VanBibber Lake primarily for sale to customers in the ordinary course of its trade or business. OPINION At the heart of the present controversy lie the parties' competing characterizations for tax purposes of the gains realized by the Corporation from the sale of lots at VanBibber Lake. The pleadings have, however, raised several additional issues with regard to the computation of those gains. We will address first the characterization issue before resolving the computational questions. A. Character of Gains Realized on Lot Sales.
Petitioners maintain that the gains realized from the VanBibber Lake lot sales are entitled to long-term capital gain treatment under the special rules set forth in section 1231, which are applicable to gains derived from the sale or exchange of property used in a taxpayer's trade or business. Respondent, however, has determined that the gains in question do not qualify for such tax-favored treatment, because the lots did not constitute "property used in the trade or business," but rather represented "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within *309 the meaning of section 1231(b)(1)(B)[5]. The burden of proving respondent's determination erroneous is on petitioners. Rule 142(a). In resolving this dispute, *310 we are bound by the Supreme Court's mandate that provisions according capital gain treatment, being exceptions to the normal tax rates, are to be construed narrowly. Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955). The question of whether the sale of property qualifies for capital gain treatment or is excluded from such treatment as property held primarily for sale in the ordinary course of a trade or business has been described as "old, familiar, recurring, vexing and ofttimes elusive." Thompson v. Commissioner,322 F.2d 122, 123 (5th Cir. 1963). In resolving the question, the courts, including the Seventh Circuit, to which this case is appealable, have approached the problem by considering a number of factors, no one of which is determinative. Biedenharn Realty Co. v. United States,526 F.2d 409, 415 (5th Cir. 1976), cert. denied 429 U.S. 819 (1976); Hansche v. Commissioner,457 F.2d 429, 432 (7th Cir. 1972); Sovereign v. Commissioner,281 F.2d 830, 833 (7th Cir. 1960); *311 Daugherty v. Commissioner,78 T.C. 623, 629 (1982). Factors that have been considered relevant include: (1) the nature and purpose of the acquisition of the property and the duration of ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. Biedenharn Realty Co. v. United States,supra;United States v. Winthrop,417 F.2d 905 (5th Cir. 1969); Hansche v. Commissioner,supra;Daugherty v. Commissioner,supra.
In Suburban Realty Co. v. United States,615 F.2d 171 (5th Cir. 1980) cert. denied, 449 U.S. 920 (1980), the Fifth Circuit Court of Appeals noted the tendency among the courts to emphasize the factors used in the *312 real estate capital gains/ordinary income analysis at the expense of losing sight of the statutory test that the factors are meant to resolve. That test essentially boils down to a three-prong inquiry: (1) what was the taxpayer's trade or business; (2) did the taxpayer hold the property primarily for sale in that business; and (3) were the sales "ordinary" in the course of business? Suburban Realty Co. v. United States,supra, 178; Cappuccilli v. Commissioner,668 F.2d 138 (2d Cir. 1981), affg. a Memorandum Opinion of this Court. With the statutory test in mind, we now turn to the factors that guide our resolution of the issue. 1. The Corporation's trade or business.
Respondent contends that the mobile home lot sales activity amounted to a trade or business during the years at issue. In support of this contention, respondent cites the frequency and substantiality of sales. Cf. Suburban Realty Co. v. United States,supra at 178. Between November 1, 1974, and October 30, 1979, the Corporation sold 331 lots for total sales of $1,423,197. The Corporation sold 121 lots in its taxable years ended October 31, 1977, through *313 October 31, 1979, the years affecting petitioners' taxable years in issue, for total gross sales of $660,010. We believe that the frequency and volume of sales here point to the conclusion that the Corporation was in the business of selling lots, and we do not accept, as discussed infra, petitioners' attempts to justify so many sales as capital transactions on the theory that the sales were part of a liquidation. We find further support for the conclusion that the Corporation was in the real estate business in the extent of the Corporation's development activity with respect to the VanBibber Lake property. Cf. United States v. Winthrop,supra, 906; Biedenharn Realty Co., Inc. v. United States,supra, 417.The Corporation installed concrete pads on the mobile home sites, and built roads, sidewalks, and sewer, water and utility lines throughout the project, besides developing the recreational lake facilities. By 1979, the accumulated value of the improvements totalled $374,355.10, an amount that greatly exceeded the original $31,000 land acquisition costs. [6] Such substantial, focussed activity is clearly indicative of the existence *314 of a trade or business for income tax purposes.
Petitioners, however, claim that the improvement activities were directed at the development of a rental mobile home park, and not toward increasing sales, and therefore are not probative of the existence of a real estate sales business. This argument is contradicted by the record. Petitioners concede that the subdivision and platting of the property was totally unrelated to any rental activity and only undertaken so as to permit the sales of lots. Moreover, although the extensive development program at the VanBibber Lake property began prior to the commencement of any sales activity, *315 it continued after the Corporation embarked upon its subdivision and sales program. Finally, the Corporation's marketing activities support our determination that it was in the business of selling lots. The Corporation advertised and promoted sales of the lots in area newspapers and at area hobby shows. At no time were any lots listed with a real estate broker. Rather, Virgil and other employees of the Corporation conducted the lot sales for the Corporation from the business office located on the property.The Corporation engaged in re-selling the lots for its customers on either a consignment or option basis. All of these activities, in our view, establish that the Corporation was in the real estate sales business during the years in issue. 2. Whether the Corporation held the VanBibber Lake lots primarily for sale.
In determining whether a taxpayer holds property "primarily for sale," as that phrase is used in sections 1221(1) and 1231(b)(1)(B), the word "primarily" must be construed as meaning "of first importance or principally." Malat v. Riddell,383 U.S. 569, 572 (1966). *316 The determination of the primary holding purpose must be made as of time of the sale or sales. Klarkowski v. Commissioner,385 F.2d 398, 400 (7th Cir. 1967); Bynum v. Commissioner,46 T.C. 295, 301 (1966). In our opinion the record before us requires the conclusion that, during the years at issue, the lots at VanBibber Lake were held primarily for sale by the Corporation. Although there is no dispute that petitioners originally acquired the property for the purpose of developing a rental mobile home park, [7] petitioners' original acquisition purpose generally would not, in and of itself, preserve in perpetuity the character of the property (see Klarkowski v Commissioner,supra, at 400; Biedenharn Realty Co., Inc. v. United States,supra, at 421) especially in view of the facts that the record shows a change in ownership (the transfer of the property from petitioners to the Corporation) and, more importantly, a change in holding purpose. *317 On brief, petitioners acknowledge, and we find, that, for the years in question, the property was held for the dual purpose of rental or sale. After due consideration of the record before us, we further find that the sale purpose predominated. Perhaps the most significant factors pointing to the preeminence of the sale purpose are the frequency and the substantiality of sales. Between 1974, when the Corporation first embarked upon its sales program, and October 31, 1979, the Corporation sold approximately 340 out of a total of 440 developed lots, with the balance either rented or held for sale or rent. These results, in our view, confirm the fact that the sales purpose had overwhelmed the rental purpose during the years in issue. The subdivision and post-subdivision development activities in which the Corporation engaged are also proof of the overriding sale purpose. We note, however, that petitioners have conceded that the subdivision of the property was undertaken to permit the sale of lots, and that a review of the Corporation's returns for the years ended October 1, 1974 through 1979, shows that a substantial part of the improvements to the property (in terms of the accumulated *318 value of improvements [8]) occurred after the decision to sell subdivided lots. Clearly, such substantial improvements undermine petitioners' claim that the sales were part of a liquidation, which ordinarily denotes a passive exit from business. Finally, our conclusion that the subdivided lots were held primarily for sale by the Corporation during the years at issue derives additional support from the percentage of the Corporation's total income attributable to the sales of subdivided lots and the fact that the lot sales shored up the declining fortunes of the Corporation's other businesses. The Corporation reported net losses from its mobile home retail sales and lot rental business for fiscal years ended October 31, 1977 through October 31, 1979 in the respective amounts of $88,031.99, $13,472.38 and $195,370.44, and net income from the sales of lots in the respective amounts of $180,941.42, $140,661.84 and $210,079.21. Petitioners seek to avoid the inescapable conclusion that follows from this comparison by maintaining that *319 the proper comparison is that of gross receipts from lot sales to gross receipts from all of the Corporation's operations. We have, however, had the occasion heretofore to point out that net income or gain provides the more valid comparison. Real Estate Corp. v. Commissioner,35 T.C. 610, 614 (1961). 3. Whether the lots were sold in the ordinary course of the Corporation's business.
In Suburban Realty Co. v. United States,615 F.2d at 178, the Fifth Circuit noted that the key factors in determining the "ordinariness" of the property sales in question are the frequency and substantiality of sales. The fact that the Corporation sold approximately 75% of its developed lots in less than six years has been discussed, supra, in connection with our determination that the Corporation was in the real estate sales business and that the lots were held primarily for sale. The frequency and substantiality of these sales also support, in our view, the conclusion that the sales were in the ordinary course of the Corporation's business. In reaching this *320 conclusion, we hasten to add that other factors in the record direct this result. The Corporation's own personnel handled all the sales and advertising and never engaged the services of an outside agent with respect to the lot sales. The Corporation routinely sold lots on an installment basis, thereby enhancing its sales volume as well as committing itself to a sales program on a long-term basis. The Corporation re-sold lots for customers. In addition, the provision in the listing agreement with Goldman & Associates, that excludes from a bulk sale at "wholesale prices" any lots sold by the Corporation prior to the close of the bulk sale supports our view that the lot sales were ordinary in the course of the Corporation's business. We think the record as a whole undermines any claim that these sales were the extraordinary type of transaction that section 1231 was intended to cover. 4. The Liquidation Exception.
Petitioners premise their objection to respondent's determination that the VanBibber lot sales were ordinary income transactions on their contention that the entire sales program was in essence the liquidation of a business. Petitioners acknowledge that the parameters *321 of the "liquidation niche" may be ill-defined, but maintain that the lot sales herein fit within the niche, as described by various judicial decisions, e.g., Biedenharn Realty Co., Inc. v. Commissioner, 526 F.2d at 420-422; Chandler v. United States,226 F.2d 403, 405-406 (7th Cir. 1955); Three States Lumber Co. v. Commissioner,158 F.2d 61, 64 (7th Cir. 1946), and therefore contend that the sales are entitled to capital gain treatment under section 1231. Petitioners cite Virgil's heart problems and Virgil's realization that their sons would not continue the business as the motivation for terminating the rental mobile home park operation. Petitioners point to the Corporation's unsuccessful attempt to find a bulk purchaser as evidence supporting their contention that a program of piecemeal sales was the only available avenue for disposing of the VanBibber Lake property. We disagree with petitioners' argument. We think the record shows that the impetus for selling lots at VanBibber Lake was at least as much due to the decline in the mobile home retail sales business, and the determination that the sale of lots would generate *322 a higher return than that derived from the lot rental operations, as it was due to Virgil's health problems and to petitioners' sons' apparent disinterest in taking over the business.Indeed, we infer from the record that, irrespective of the gravity of Virgil's health problems, Virgil himself could not have taken the problems seriously inasmuch as he continued to work fourteen hours a day, seven days a week, after receiving the physicians' advice. There clearly was no attempt to "wind down" the Corporation's operations following the decision to subdivide the property. [9] This is not a case where the change in holding the property for rent to holding the property for sale was induced by such "unanticipated, externally induced factors which make impossible the continued pre-existing use of the realty," Biedenharn Realty Co., Inc. v. Commissioner, 526 F.2d at 421, and we therefore find such cases as Chandler v. United States,supra, and Three States Lumber Co. v. Commissioner,supra, upon which petitioners rely, to be inapplicable.
*323 Even assuming that petitioners truly intended to extricate themselves from the business, we do not accept petitioners' argument that piecemeal sales were the only available avenue. They were advised that Goldman & Company would not make them an offer because the property posed a management problem. This problem as it affects the marketability of the property is undoubtedly "a different kettle of fish" than that presented in a case in which piecemeal sales are the only means of disposing of a tract of land that is too large to be marketable. See e.g., Chandler v. United States,supra.
Finally, and again assuming that the sales were made in liquidation of the Corporation, we do not believe that the mere fact that sales are transacted in furtherance of a liquidation warrants automatically according the sales capital gain treatment. We think the record clearly shows that the Corporation, in disposing of the lots, undertook all aspects of a full-blown real estate business, and that what petitioners claim to have been an on-going, gradual liquidation became an actively conducted business, in and of itself. We conclude that the transactions in question were *324 sales in the ordinary course of the Corporation's business and that therefore respondent properly treated the gain realized therefrom as ordinary income. B. Computational Issues
Respondent also determined that the Corporation's computation of its basis in the lots sold during the years in issue did not reflect actual costs of land and improvements with respect to each lot, but rather reflected the assignment of arbitrary amounts to each lot. Although petitioners alleged in their petition that respondent's determination was erroneous, petitioners have introduced no evidence to explain, let alone support, the method by which the costs of land and improvements were determined in computing the Corporation's basis in each lot. Indeed, the 1977 and 1978 returns filed by the Corporation show that the adjusted bases of the lots sold were computed as being equal to 20% of the sales price.Such in unorthodox method does not comport with the rules for determining basis. Sec. 1012. Respondent's determination must therefore be sustained. Respondent also disallowed the depreciation deductions with respect to the lot improvements claimed on the Forms 1120S for each of the years in issue. *325 Respondent based his disallowance on his determination that the cost of improvements was deducted as an expense in each year and that therefore the depreciation deduction claimed on the same amounts constituted a double deduction. Petitioners have the burden of showing that none of the depreciation claimed by the Corporation on lot improvements corresponds to amounts that had previously been expensed. Rule 142(a). Petitioners have introduced no evidence to refute respondent's determination, and indeed we find nothing in the record that sheds any light on the matter. [10] Respondent's determination is therefore sustained. [11]
*326 Finally, as to whether respondent correctly determined that the Corporation erroneously reported under sections 1374 and 1375 the ordinary losses and capital gains realized during the years at issue, our determination that the lot sales were ordinary income transaction obviates the need for addressing the question. To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect for the years in issue.↩
2. The park also included camping sites that were developed to accomodate travel trailers.↩
3. Sweating a joint apparently involves soldering two pieces of pipe together. Webster's New Collegiate Dictionary (1973).↩
4. The five lots sold in 1971 resulted in total sales of $27,300. All five sales were made on an installment basis, with a total of $4,489 received from the purchasers during the fiscal year ended October 31, 1971. Total receipts from the 1972 and 1973 sales amounted to $11,000 and $12,000, respectively. None of the sales in 1972 and 1973 were installment sales.↩
5. Section 1231(b) reads as follows: (b) Definition of Property Used in the Trade or Business.--For purposes of this section-- (1) General Rule.--The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 1 year, and real property used in the trade or business, held for more than 1 year, which is not-- (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) A copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer described in paragraph (3) of section 1221↩.
6. On brief, respondent argues that the ratio of improvements to original land costs exceeded 25 to 1. Respondent apparently computes the ratio by reducing the original land costs of $31,000 to reflect the sale of 96.68 acres in March, 1974 to Little Walnut Creek Conservancy District. Our review of the record failed to disclose sufficient evidence for determining the Corporation's basis in the acreage sold, and therefore we are not able to determine the amount of original land costs attributable to the remaining acreage after the March, 1974 sale.↩
7. Respondent argues that the purpose for which petitioners acquired the property in 1962 and 1967 should be given little or no weight because it is the Corporation's purpose upon acquiring the property in 1970 that matters herein. We need not decide the evidentiary weight to be given the Corporation's acquisition purpose or petitioners' acquisition purpose in view of the overwhelming evidence in the record of the dominance of the sale purpose during the years at issue.↩
8. As of October 31, 1973, accumulated improvements had a total value of $132,343.28. By October 31, 1979, this amount increased to $374,355.10.↩
9. Petitioners point out that the fact that the purported piecemeal liquidation spanned a number of years was due, at least in part, to the fact that the Corporation could only sell a lot with a dwelling under the OILSR regulations. The record clearly shows that the Corporation could have sold bare lots by filing a registration statement but chose not to do so. Thus, we do not agree that OILSR requirement was a "third-force" factor that could justify the duration of the purported liquidation.↩
10. We note that the accountant for the Corporation was included on the list of witnesses submitted with petitioners' trial memorandum. At trial, petitioners' counsel advised the Court that the accountant would not be called as a witness even though he was present in the courtroom. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). 11. The stipulation submitted at trial by the parties states that the costs of the same improvements for which depreciation was claimed were included in the Corporation's basis in computing gain from the sale of lots. On brief, petitioners argue that "as a matter of law" the Corporation is "entitled to offset the cost of sales of lots by an apportionable amount of basis in improvements and to ongoing depreciation deductions on the remainder of the basis in the improvements." We do not find petitioners' argument to be responsive to respondent's determination that the expensing of the cost of improvements in the year made and the depreciation deduction for the same amount in subsequent years constitute double deductions.↩