T.C. Memo. 2012-243

UNITED STATES TAX COURT

PATRICIA A. FLOOD AND DONALD J. FLOOD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29379-08.                        Filed August 27, 2012.

Patricia A. Flood and Donald J. Flood, unrepresented.

<u>Michael J. Gabor</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The respondent determined deficiencies in the

petitioners' federal income tax and accuracy-related penalties under section 6662(a)

for the 2004 and 2005 tax years.  Unless otherwise indicated, all section references

are to the Internal Revenue Code as in effect for the 2004 and 2005 tax years.  The

respondent is referred to as the IRS.  The petitioners are referred to as the Floods.

[*2] The issues for decision are:

(1)     whether gains from sales of real-estate lots during the tax years 2004 and

2005 were ordinary income or capital gain;

(2)     whether the basis of real-estate lots sold in 2004 should be reduced from

$10,000 to $4,286;

(3)     whether the basis of real-estate lots sold in 2005 should be reduced from

$631,044 to $61,600 (or $62,600);

(4)     whether gross receipts for 2004 from the sale of real-estate lots should be

increased from $15,780 to $41,900;

(5)     whether gross receipts for 2005 from the sale of real-estate lots should be

increased from $1,754,135 to $1,959,500;

(6)     whether a $2,870 deduction is allowed for cash contributions to charity for

2004;

(7)     whether a $15,608 deduction is allowed for cash contributions to charity for

2005;

(8)     whether a $9,780 deduction claimed on Schedule A, Itemized Deductions, is

allowed for investment interest expenses for 2005;

(9)     whether an $80,500 Schedule A itemized deduction is allowed for "402 lot re

tax" for 2005;

**[*3]** (10)   whether the Floods are liable for self-employment taxes of $5,227 and $61,600 for 2004 and 2005, respectively;

(11)   whether a $717,000 deduction is allowed for noncash contributions to charity for 2005;

(12)   whether the Floods are liable for accuracy-related penalties under section 6662 of $2,112.20 and $116,728.20 for 2004 and 2005, respectively.

## FINDINGS OF FACT

The Floods resided in Florida when they filed their petition.

During 2004 and 2005 Mr. Flood was a day trader in the stock market. The Floods also operated a real-estate venture, which included the purchase and sale of vacant lots. The Floods did not generally subdivide the lots or construct houses on the lots they purchased. Mr. Flood located prospective sellers of lots by sending out mass mailings based on county records. From 2001 to 2008 the Floods purchased at least 250 lots. During 2004 they sold two lots. During 2005 they sold 40 lots and gave 11 lots to the Sawyer Road Baptist Church.

On or about October 15, 2005, the Floods jointly filed a Form 1040, U.S. Individual Income Tax Return, for 2004.

On or about August 15, 2006, they jointly filed a tax return for 2005.

[*4]   On September 10, 2008, the IRS issued a notice of deficiency determining the

following deficiencies and penalties:

| Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| 2004 | $10,561 | $2,112.20 |
| 2005 | 583,641 | 116,728.20 |

The adjustments that underlie the deficiencies are described in the table below.

| [*5] Year | Reported on return | Adjustments by IRS in notice of deficiency |
|---|---|---|
| 2004 | $15,780 gross receipts from sales of two real-estate lots (gain from which was reported on Schedule D as capital gain) | Gross receipts increased to $41,900 and the gain from the sales was transferred to Schedule C as ordinary income |
| | $10,000 basis of two real-estate lots sold | Basis reduced to $4,286 and transferred to Schedule C as cost of goods sold, an offset against ordinary income |
| | $2,870 deduction for cash contributions to charity | $0 |
| | No deduction for Schedule C expenses | $620 deduction for Schedule C expenses |
| | No self-employment tax | $5,227 of self-employment tax based on other adjustments |
| 2005 | $1,754,135 gross receipts from sales of 40 real-estate lots (gain from which was reported on Schedule D as capital gain) | Gross receipts increased to $1,959,500 and the gain from the sales was transferred to Schedule C as ordinary income |
| | $631,044 basis of the 40 real-estate lots sold | Basis reduced to $61,600 and transferred to Schedule C as cost of goods sold, an offset against ordinary income |
| | No deduction for Schedule C expenses | $12,400 deduction for Schedule C expenses |
| | $15,608 deduction for cash contributions to charity | $0 |
| | $80,500 deduction for "402 lot re tax" | $0 |
| | $9,780 investment interest expense deduction | $0 |
| | $717,000 deduction for contributions of 11 real-estate lots to Sawyer Road Baptist Church | $15,010 deduction |
| | No self-employment tax | $61,600 self-employment tax based on other adjustments |

As noted in the table above, the Floods reported on their return that the gross receipts from the sale of lots in 2005 was $1,754,135. Page 7 of the IRS's pretrial memorandum agrees that this was the amount the Floods reported, although on page 3 the IRS says the reported amount was $1,754,780.

**[*6]**   On or about December 4, 2008, the Floods filed a petition challenging the notice of deficiency.

On December 19, 2011, the IRS moved the Court to order the Floods to show cause why the 75 numbered paragraphs in a draft stipulation should not be deemed stipulated.  On December 23, 2011, the Court granted the motion, ordering the Floods to show cause by January 9, 2012, why the paragraphs in the draft stipulation should not be deemed stipulated.  The Floods did not file a response to the order.  On January 18, 2012, the Court ordered the paragraphs in the draft stipulation deemed stipulated.

The case was tried on February 6, 2012.  The Floods filed a pretrial memorandum on the day of trial, which is a violation of our standing pretrial order.  The IRS filed its pretrial memorandum on January 9, 2012.

OPINION

One procedural matter requires attention before we proceed to the merits of this case.  When the case was called for trial, Patricia A. Flood did not appear, nor was there any appearance on her behalf.  Donald J. Flood did appear.  As Donald J. Flood had no authority to represent his wife, and there was no other appearance by her or on her behalf, the Court will, on its own motion, dismiss her from this case for lack of prosecution.  Decision will be entered against Patricia A. Flood for

**[\*7]** a deficiency and a penalty in the same amounts as those ultimately determined against Donald J. Flood.

The taxpayer bears the burden of proving by a preponderance of the evidence that the IRS's determinations in the notice of deficiency are incorrect. Tax Ct. R. Pract. & Proc. 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bronstein v. Commissioner, 138 T.C. ___ (May 17, 2012). Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax and meets other requirements, the burden of proof rests on the IRS as to that factual issue. The Floods have not established their compliance with the requirements of section 7491(a). They bear the burden of proof with respect to the deficiencies and penalties determined in the deficiency notice. Tax Ct. R. Pract. & Proc. 142(a).

1. Whether gains from sales of real-estate lots during the tax years 2004 and 2005 were ordinary income or capital gain

This first issue is whether the Floods properly claimed capital gain treatment on the sale of their lots. The answer depends on whether the Floods held the property primarily for sale to customers in the ordinary course of business or held it, alternatively, as a capital asset. If they held the property primarily for sale in the ordinary course of business, as the IRS argues, the proceeds to the Floods

**[*8]** will be treated as ordinary income and we must sustain the IRS's

determination with respect to that income.  If the property was held as a capital

asset, then the proceeds to the Floods should be treated as capital gains and we

must sustain the Floods' position.

Under section 1221(a)(1), property is not a capital asset if it is "stock in

trade of the taxpayer or other property of a kind which would properly be included

in the inventory of the taxpayer * * * or property held by the taxpayer primarily

for sale to customers in the ordinary course of his trade or business".  The

Supreme Court has defined "primarily" as used in this context to mean

"principally" or "of first importance".  Malat v. Riddell, 383 U.S. 569, 572 (1966);

Biedenharn Realty Co. v. United States, 526 F.2d 409, 422-423 (5th Cir. 1976).

The question of whether property is held primarily for sale to customers in the

ordinary course of a taxpayer's business begins with a factual analysis.  Pritchett

v. Commissioner, 63 T.C. 149, 162 (1974).  Typically, the factors in making this

determination include:  (1) the taxpayer's purpose in acquiring the property; (2)

the purpose for which the property was subsequently held; (3) the taxpayer's

everyday business and the relationship of the income from the property to the

taxpayer's total income; (4) the frequency, continuity, and substantiality of sales of

property; (5) the extent of developing and improving the property to increase the

[*9] sales revenue; (6) the extent to which the taxpayer used advertising, promotion, or other activities to increase sales; (7) the use of a business office for sale of property; (8) the character and degree of supervision or control the taxpayer exercised over any representative selling the property; and (9) the time and effort the taxpayer habitually devoted to sales of property. Biedenharn Realty Co., 526 F.2d at 415-422; United States v. Winthrop, 417 F.2d 905, 910-911 (5th Cir. 1969). The frequency and substantiality of sales is especially probative. Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980).

We first examine the Floods' purpose for acquiring and holding the properties. Mr. Flood testified that the Floods bought the land for investment purposes. He asserts that the Floods sold lots only to pay real-estate taxes and that they sold only a few of the lots in 2004 and 2005. Although it appears that the Floods sold only some of the lots they owned during the two years at issue, the gains from these sales were spectacular. Even according to the Floods' tax return for 2005, they sold properties in 2005 for $1,754,135 that they had originally purchased for $631,044. This is a gain of over $1 million. As we explain in parts 3 and 5 below, the actual gain was even greater than that. Furthermore, we surmise that the values of the remaining lots not sold by the Floods in 2004 and 2005 were relatively low compared to the values of the lots that were sold.

[*10] In summary, we infer that the purpose of acquiring and holding the real-estate lots that the Floods acquired as part of their real-estate venture was to make money by buying the lots at a bargain and reselling them.  Selling some of the lots in 2004 and 2005 was a part of the Floods' successful execution of this strategy.  The Floods sold the lots that had a high value when the opportunity presented itself.

We also consider the taxpayer's everyday business and the relationship of the income from the property to the taxpayer's total income.  The Floods argue that their everyday business was not the sale of real estate because Mr. Flood was a day trader.  However, the income from Mr. Flood's day trading was modest compared to the Floods' gains from their real-estate venture.  According to their tax returns, which are unchallenged on this point, Mr. Floods' stock trades generated only $25,901 of gains in 2004 and $24,153 of gains in 2005.

We also consider the frequency, continuity, and substantiality of the Floods' sales of lots.  The Floods sold 2 lots in 2004 and 40 lots in 2005.  The two lots that were sold in 2004 had been purchased in 2003.  Of the 40 lots sold in 2005, 11 lots had been purchased in 2001, 15 lots in 2002, 12 lots in 2003, 1 lot in 2004, and 1 lot in 2005.  Although many lots remained unsold, the record reveals little

[*11] about the cost or value of the unsold lots. We surmise that the value was relatively insignificant.

In considering the remaining factors, we find that the Floods put considerable effort into their real-estate venture even though they did not develop or improve the properties (factor 5) or use a business office (factor 7). The Floods examined public records to determine which property owners to contact to purchase the lots, mailed letters to the property owners to facilitate the Floods' purchase of the lots, prepared agreements for execution, prepared deeds, paid legal fees to clear title to properties they purchased, paid legal fees to ensure the closing of the Floods' properties, paid legal fees to enforce specific performance of purchase and sale agreements, conducted research, made phone calls, and used a real-estate agent to sell lots. (Because Mr. Flood supervised and controlled the agent, factor (8) weighs against capital gain treatment). In addition, Mr. Flood himself placed advertisements to sell lots on a website he created and placed advertisements to sell lots in public places such as grocery stores.

The preponderance of credible evidence supports a conclusion that the Floods' real-estate transactions were conducted in the ordinary course of a trade or business and not for investment purposes. Accordingly, we find that the IRS

[*12] correctly treated the Floods' real-estate activities as giving rise to ordinary income derived from a trade or business.

2.   Whether the total basis of real-estate lots sold in 2004 should be reduced from $10,000 to $4,286

In their pretrial memorandum, the Floods claim that the amounts reported on their return regarding their gains from their real-estate venture were correct. However, the Floods did not provide any documents or testimony regarding the amounts of these gains. The IRS established through deemed admissions that Exhibit 8-J to the draft stipulation summarizes information about the real-estate lots the Floods sold in 2004 and 2005. According to Exhibit 8-J, the cost basis of the lots sold in 2004 was $4,286.

We find that the cost basis of the lots sold in 2004 was $4,286.

3.   Whether the total basis of real-estate lots sold in 2005 should be reduced from $631,044 to $61,600 (or $62,600)

In their pretrial memorandum the Floods claim that the amounts reported on their return regarding their gains from their real-estate venture were correct. However, the Floods did not provide any documents or testimony regarding the amounts of these gains. In the notice of deficiency, the IRS determined that the cost basis of the lots sold in 2005 was $61,600. Through deemed admissions, it was established that Exhibit 8-J to the draft stipulation summarizes information

[*13] about the real-estate lots the Floods sold in 2004 and 2005. According to Exhibit 8-J, the cost basis of the lots sold in 2005 was $62,600, not $61,600.

We find that the cost basis of the lots sold in 2005 was $62,600.

4.  Whether gross receipts from the sale of real-estate lots in 2004 should be increased from $15,780 to $41,900

In their pretrial memorandum, the Floods claim that the amounts reported on their return regarding their gains from their real-estate venture were correct. However, the Floods did not provide any documents or testimony regarding the amounts of these gains. The IRS established through deemed admissions that Exhibit 8-J to the draft stipulation summarizes information about the real-estate lots the Floods sold in 2004 and 2005. According to Exhibit 8-J, the gross receipts for the lots sold in 2004 were $41,900.

We hold that the gross receipts for the lots sold in 2004 were $41,900.

5.  Whether gross receipts from the sale of real-estate lots in 2005 should be increased from $1,754,135 to $1,959,500

In their pretrial memorandum, the Floods claim that the amounts reported on their return regarding their gains from their real-estate venture were correct. However, the Floods did not provide any documents or testimony regarding the amounts of these gains. The IRS established through deemed admissions that Exhibit 8-J to the draft stipulation summarizes information about the real-estate

**[\*14]** lots the Floods sold in 2004 and 2005. According to Exhibit 8-J, the gross receipts for the lots sold in 2005 were $1,959,500.

We find that the gross receipts for the lots sold in 2005 were $1,959,500.

6.  Whether a $2,870 deduction is allowed for cash contributions to charity for 2004

The record does not contain any support for the proposition that the Floods made any cash contributions to charity in 2004. We hold that the Floods are not entitled to a deduction for cash contributions to charity for 2004.

7.  Whether a $15,608 deduction is allowed for cash contributions to charity for 2005

The record does not support the proposition that the Floods made any cash contributions to charity in 2005. We hold that the Floods are not entitled to a deduction for cash contributions to charity for 2005.

8.  Whether a $9,780 Schedule A itemized deduction is allowed for investment interest expenses for 2005

The record does not support the proposition that the Floods incurred investment interest expense for 2005. We hold that the Floods are not entitled to a deduction for investment interest expense for 2005.

**[*15]** 9. <u>Whether an $80,500 Schedule A itemized deduction is allowed for "402 lot re tax" for 2005</u>

The Floods reported an $80,500 deduction for "402 lot re tax" for 2005. They had also reported a $10,508 deduction for "Real estate taxes". The $10,508 deduction is unchallenged by the IRS, but the $80,500 deduction is in dispute. At trial, the Floods produced no evidence that they incurred an expense corresponding to "402 lot re tax". We hold that the Floods are not entitled to a deduction for "402 lot re tax."

10. <u>Whether the Floods are liable for self-employment taxes of $5,227 and $61,600 for 2004 and 2005, respectively</u>

Section 1401(a) and (b) imposes a tax on the net earnings from self-employment derived from any trade or business carried on by the taxpayer. The term "trade or business" has the same meaning under section 1402(a) (defining "net earnings from self-employment") as under section 162. The Floods were engaged in the trade or business of purchasing and selling real property during the years at issue. On the basis of our finding that the Floods earned income from their real-estate trade or business, they are liable for tax on their net earnings under section 1401 and entitled to a deduction under section 164(f).

[*16] 11.   Whether a $717,000 deduction is allowed for noncash contributions to charity for 2005

The Floods gave 11 real-estate lots to charity.  They reported that the total value of the lots was $717,000.  The IRS determined that the charitable contribution deduction is limited to the cost basis of the lots--which it determined to be $15,010-- because the Floods held the donated lots primarily for sale to customers in the ordinary course of business.  See sec. 170(e)(1)(A); Jones v. Commissioner, 129 T.C. 146, 158-159 (2007), aff'd on other grounds, 560 F.3d 1196 (10th Cir. 2009).

The 11 lots donated to charity were purchased as part of the same real-estate venture as the lots that the Floods sold in 2004 and 2005.  Our findings regarding the lots that were sold (see part 1) also apply to the 11 lots that were donated.  The only exception is that the record does not reveal the date that the 11 lots were purchased.  On the preponderance of the evidence, we find that the Floods held the 11 lots primarily for sale to customers in the ordinary course of business, and so the amount of their noncash charitable-contribution deduction is limited to their cost basis, $15,010.

**[\*17]** 12. <u>Whether the Floods are liable for accuracy-related penalties under section 6662 of $2,112.20 and $116,728.20 for 2004 and 2005, respectively</u>

Under section 7491(c), the IRS bears the burden of production with respect to penalties. In order to meet this burden, the IRS must come forward with sufficient evidence indicating that it is appropriate to impose a particular penalty. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). If the IRS has satisfied the burden of production, the taxpayer then bears the burden of persuading the Court that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. See Tax Ct. R. Pract. & Proc. 142(a)(1); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

In the notice of deficiency, the IRS determined that the Floods are liable for section 6662(a) accuracy-related penalties of $2,112.20 and $116,728.20 for 2004 and 2005, respectively. Section 6662(a) and (b)(1) and (2) imposes a penalty of 20% of any underpayment attributable to (1) a substantial understatement of income tax or (2) negligence or disregard of rules and regulations. In general, an understatement of income tax is the amount of tax required to be shown on the return less the amount of tax actually shown on the return. See sec. 6662(d)(2)(A); sec. 1.6662-4(b)(2), Income Tax Regs. An understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.

**[\*18]** Sec. 6662(d)(1)(A); sec. 1.6662-4(b)(1), Income Tax Regs. The amount of the understatement is reduced to the extent that (1) there is or was substantial authority for the taxpayer's treatment of the item or (2) the taxpayer had a reasonable basis for taking a position and the position was adequately disclosed. Sec. 6662(d)(2)(B). An underpayment is attributable to negligence if the taxpayer did not make a reasonable attempt to comply with applicable tax laws or failed to exercise reasonable care in the preparation of a return. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes a failure to maintain accurate records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.

Whether attributable to negligence or a substantial understatement of income tax, no accuracy-related penalty is imposed on any portion of an underpayment with respect to which the taxpayer had reasonable cause and acted in good faith. See sec. 6664(c)(1). Whether the taxpayer acted with reasonable cause and in good faith is determined on a case-by-case basis, taking into account all relevant facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to properly determine his or her tax liability. Id.

[*19] The Floods had underpayments of tax for the 2004 and 2005 tax years. An underpayment is defined generally as the difference between the tax imposed and the tax reported on the tax return. Sec. 6664(a).

As explained below, we hold that the Floods had reasonable cause for the portion of each year's underpayment that was due to (1) the Floods' position that the lots they sold in 2004 and 2005 were capital assets and therefore generated capital rather than ordinary gains, and (2) the Floods' position that the lots they donated to the church in 2005 were capital assets, were worth $717,000, and therefore gave rise to a charitable-contribution deduction of $717,000.

We first find that the Floods had reasonable cause for reporting the lots in question as capital assets and that they did so in good faith. The lots are the types of assets that could conceivably be capital assets. Whether they are capital assets is a close question.

Second, we find that the Floods had reasonable cause for reporting that the value of the 11 lots donated to charity was $717,000. The Floods based the reported value on an appraisal that they attached to their tax return for 2005. After reviewing the appraisal, we conclude that the value was reported in good faith.

Next, we address the portions of the underpayments that are not due to (1) the Floods' position that the lots they sold in 2004 and 2005 were capital assets and

[*20] therefore generated capital gains rather than ordinary income, and (2) the Floods' position that the lots they donated to the church in 2005 were capital assets, were worth $717,000, and therefore gave rise to a charitable-contribution deduction of $717,000. These remaining portions of the underpayments, we find, are not attributable to reasonable cause or good faith. Furthermore, the remaining portions are attributable to negligence or disregard of rules or regulations. On the basis of the record, the Floods maintained little or no documentation supporting the positions they took on the returns related to the remaining portions of the underpayments. Finally, the remaining portions of the underpayments constitute understatements. We are unable to determine at this stage whether the remaining portions of the underpayments result from substantial understatements of income tax. That determination must await a Rule 155 computation.

To reflect the foregoing,

An appropriate order of dismissal and decision will be entered under Rule 155.